[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 30, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-14595

_____

D. C. Docket No. 03-00028-CV

JACK E. ALDERMAN,

Petitioner-Appellant,

versus

WILLIAM TERRY, Warden,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(October 30. 2006)

Before TJOFLAT, ANDERSON, and CARNES, Circuit Judges.

TJOFLAT, Circuit Judge:

The petitioner, Jack E. Alderman, is a Georgia prisoner on death row, having

been convicted of the 1974 murder of his wife, Barbara J. Alderman, in the Superior Court of Chatham County, Georgia. On July 16, 2004, the United States District Court for the Southern District of Georgia denied his petition for a writ of habeas corpus, and he appealed. We granted his application for a certificate of appealability as to one issue: whether Alderman's trial attorneys denied him the effective assistance of counsel in the penalty phase of his sentencing proceedings by failing to investigate and present to the jury his social-history background.[1]

From the time of the murder to the present appeal, this case has extended over thirty-two years. Needless to say, the procedural history of this case is extensive and complex. For the sake of clarity, we organize the opinion as follows: part I provides the factual background and procedural history of the case; part II focuses on Alderman's 1984 re-sentencing trial; part III outlines Alderman's ineffective assistance claim, the evidence presented to the Superior Court of Butts County, Georgia at the evidentiary hearing it held on the claim, and that court's findings of fact and conclusions of law; part IV spells out Alderman's challenge to those findings and conclusions and explains why we cannot overturn them and,

---

[1] The Sixth Amendment to the United States Constitution guarantees a criminal defendant in federal court the right to the effective assistance of counsel. Johnson v. Zerbst, 304 U.S. 458, 462, 58 S. Ct. 1019, 1022, 82 L. Ed. 1461 (1938). This right is guaranteed a defendant in a state court criminal prosecution by the Due Process Clause of the Fourteenth Amendment. Gideon v. Wainright, 372 U.S. 335, 342, 83 S. Ct. 792, 795, 9 L. Ed. 2d 799 (1963).

therefore, must deny the relief that Alderman seeks.

# I.

## A.

The following statement of facts is an excerpt from <u>Alderman v. Zant</u>, 22

F.3d 1541,1544–1546 (11th Cir. 1994).[2]

> The Petitioner, Jack E. Alderman ("Alderman"), and his wife, Barbara Alderman ("Mrs. Alderman"), lived in an apartment in Chatham County [,] Georgia. Alderman was employed as an assistant manager at the local Piggly Wiggly supermarket. Mrs. Alderman was employed in the Tax Assessor's office for the City of Savannah. In conjunction with her employment, Mrs. Alderman maintained a $10,000.00 life insurance policy that paid double benefits in the event of accidental death. Mrs. Alderman also had another life insurance policy in the amount of $25,000.00 which named her mother as beneficiary.
> Alderman met John Arthur Brown ("Brown"), later convicted as an accessory to Mrs. Alderman's murder, when both Alderman and Brown were employed in the vehicle maintenance department for the City of Savannah. Brown testified that on September 19, 1974, Alderman phoned Brown and asked him to meet him at the Piggly Wiggly supermarket. Brown stated that during this meeting Alderman asked Brown to kill Mrs. Alderman in exchange for half the insurance proceeds. Brown, although claiming not to take Alderman seriously, accepted the proposition.
> On Saturday, September 21, 1974, Alderman asked Brown to come to his apartment. When Brown arrived, Alderman handed Brown a twelve-inch crescent wrench and instructed Brown to go into the bedroom and kill Mrs. Alderman. Testimony indicates that Brown was initially reluctant, but agreed to strike Mrs. Alderman when persuaded by the gun wielding Alderman. Brown entered the dining

---

[2] In <u>Alderman v. Zant</u>, we affirmed the district court's denial of a writ of habeas corpus on claims that are not implicated in this appeal.

room and struck Mrs. Alderman in the head with the wrench. Mrs. Alderman cried out and ran into the living room where she confronted her husband. Alderman tackled Mrs. Alderman, then assisted by Brown, placed his hands over Mrs. Alderman's nose and mouth until she was unconscious.

Alderman and Brown carried Mrs. Alderman's limp body to the bathroom and placed it in the bathtub. Alderman started to fill the tub while Brown cleaned the blood stains from both the living and dining rooms. Alderman and Brown changed clothes and left the apartment for several hours. The two men went to the Piggly Wiggly supermarket where Alderman borrowed $100.00. Alderman and Brown then went to two local Savannah bars. At some time during the evening Alderman gave Brown the $100.00.

Alderman and Brown returned to the apartment around 10:00 p.m., removed Mrs. Alderman's body from the bathtub and wrapped it in a green quilt. The two men carried the body to Alderman's 1974 Pontiac and placed it in the trunk. Brown drove Alderman's car as Alderman followed on his motorcycle. Alongside a creek in Rincon, Georgia, Brown and Alderman removed the body from the trunk and placed it in the driver's seat. At Alderman's direction, Brown reached in the driver's window and released the emergency brake allowing the car to roll into the creek. The car stopped halfway into the creek. Again at Alderman's direction, Brown opened the car door, pulled Mrs. Alderman's body halfway out and allowed her face to fall into the creek. The two men removed the green quilt and the rubber trunk mat from the car and fled the scene on Alderman's motorcycle.

Later that evening, on September 21, 1974, Randy Hodges ("Hodges") and Terry Callahan ("Callahan") were driving home on Baker Hill Road and Highway 131. As they turned onto Highway 131 and approached Dasher's Creek, they noticed a car in the creek. Hodges jumped out, saw that there was a woman in the car and sent Callahan to Lamar Rahn's house to call for help. Effingham County Sheriff Lloyd Fulcher ("Fulcher") responded to the call. Upon his arrival at the scene, Fulcher found the victim's car in the water adjacent to the bridge. Fulcher noticed no apparent physical damage to the car. He ordered Mrs. Alderman's body to be removed from the car and taken to the hospital. Fulcher observed that there were no skid marks from the car but that motorcycle tracks were apparent in the

4

area. Fulcher also noticed blood stains on the seat of the car and that the trunk mat was missing.

At the direction of Fulcher, Garden City police officer J.D. Crosby ("Crosby") went to Alderman's apartment only to find it locked. Crosby later returned to the apartment at approximately 2:30 a.m. and found Alderman there with a woman. Crosby informed Alderman that his wife had been involved in a traffic accident, and asked him to accompany Effingham County authorities to the hospital. Georgia Bureau of Investigation Agent H.H. Keadle ("Keadle") was present at the Effingham County hospital. Keadle and Fulcher noticed red/brown stains in the seat and crotch of Alderman's pants and on his belt. At that time, Alderman's clothes were taken from him.

Keadle's investigation confirmed Crosby's findings at the accident scene. Keadle also recovered a stained portion of a green rug and Alderman's motorcycle helmet, which had been removed from the Alderman's apartment by Mrs. Alderman's mother. Alderman's father, Jack Alderman, Sr., also gave the police the twelve inch crescent wrench that he had removed from Alderman's apartment.

Forensic Serologist Elizabeth Quarles, of the Georgia State Crime Laboratory, examined the blood found on Alderman's clothes. The blood type was consistent with Mrs. Alderman's blood. An examination of the vehicle revealed one palm print and four fingerprints which were stipulated as Alderman's. Brown's fingerprints, however, were not found on the car.

Dr. Charles Sullinger ("Dr. Sullinger") performed the autopsy upon Mrs. Alderman's body. Dr. Sullinger concluded that the laceration on the back of Mrs. Alderman's head was inflicted by a blunt instrument. Dr. Sullinger also concluded that because there existed only a small amount of blood in the car, the blow to Mrs. Alderman's head did not occur as a result of the accident. Dr. Sullinger found no evidence of any abnormalities in the heart, no scratches on the forearms and no evidence of strangulation. Dr. Sullinger concluded that the liquid in Mrs. Alderman's lungs revealed that Mrs. Alderman died as a result of asphyxia due to drowning.

Keadle's investigation led him to Brown. Brown eventually gave a statement incriminating himself and Alderman. At trial, Alderman testified on his own behalf and denied that he killed his wife. Alderman testified that on the night of September 21, 1974, he

5

and his wife had an argument and that he left the apartment alone. He allegedly took a bus to Savannah where he spent some time at two local bars. Alderman testified that he returned home at approximately 10:00 p.m. but his wife was not at home. Alderman decided to go to Rincon, Georgia to see if Mrs. Alderman was at her grandparent's home. A more complete version of Alderman's defense may be found in Alderman v. State, 241 Ga. 496, 246 S.E.2d 642, 644–45, cert. denied, 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666 (1978), reh'g denied, 439 U.S. 1122, 99 S.Ct. 1036, 59 L.Ed.2d 84 (1979).

Alderman testified that on his way to Rincon, he observed his car on the side of the bridge at Dasher's Creek. Alderman stopped his motorcycle and went to the car where he discovered his wife's body. Alderman stated that he picked up Mrs. Alderman's head and placed it in his lap. Upon hearing a noise, Alderman fled the scene in shock and fear. Alderman allegedly forgot about his wife's body, drove to Savannah and returned to a local bar. Alderman then went to Johnny Ganem's for breakfast with friends. While at breakfast, Alderman offered Gerlina Carmack (the female present in the Alderman's apartment when Officer J.D. Crosby arrived) a ride home. Alderman had allegedly stopped at his apartment to pick up a jacket when the police arrived and took him to the hospital where he identified his wife's body.

Alderman testified that he did not know why he had left his wife's body in the creek; that he recalled nothing of his trip back to Savannah; and, the fact that his wife was dead had completely left his mind. Appellant testified that he first realized the full facts surrounding his wife's death after being treated by a psychiatrist who was able to refresh his memory as to the events surrounding her death. He further testified that after being treated by the psychiatrist he realized that fear had caused him to leave his wife's body in the creek because he knew her family would blame him for her death.

6

B.

As noted supra, on July 16, 2004, the district court denied Alderman's application for a writ of habeas corpus. Alderman v. Schofield, No. CV403-028 at 5–9 (S.D. Ga. July 16, 2004). In its dispositive order, the court recounted the procedural history of this case – the prosecution in the Chatham County Superior Court, the appeals to the Georgia Supreme Court, the collateral attacks in the Butts County Superior Court, and the habeas proceedings in federal court.

On June 14, 1975, Petitioner was convicted in the Superior Court of Chatham County for killing his wife, and then he was sentenced to death. Following his conviction, he appealed to the Georgia Supreme Court, which denied his appeal on June 27, 1978. Certiorari was later denied by the United States Supreme Court on November 27, 1978. He then filed for state habeas relief in the Superior Court of Chatham County, Georgia. In June 1979, the Georgia Supreme Court denied Petitioner a certificate of probable cause to appeal. The United States Supreme Court denied certiorari on February 19, 1980, and denied a rehearing on March 19, 1980.

Petitioner then filed an application for habeas relief in federal district court on June 27, 1980. This first round of federal habeas appeals culminated in 1983 when the Fifth Circuit, Unit B, acting en banc, granted a new sentencing trial, which began in March 1984. After his re-sentencing trial, Petitioner was again sentenced to death on April 1, 1984. He then filed a motion for new trial and an amendment thereto, which were denied in an order filed on August 27, 1984. Petitioner directly appealed his death sentence to the Georgia Supreme Court, which affirmed his new death sentence on February 28, 1985. On October 15, 1985, the United States Supreme Court denied certiorari and later denied a rehearing on November 18, 1985.

Petitioner then began a second round of habeas appeals in the state and federal courts with the same attorneys who represented him at the re-sentencing trial. He filed a state habeas petition in the

7

Superior Court of Butts County on February 6, 1986. An amended habeas petition was filed June 16, 1987, and a second amended habeas petition was filed June 25, 1987. Following an evidentiary hearing on June 29, 1987, the state habeas court dismissed the petition on September 10, 1987, holding that all of Petitioner's claims were barred from review because of procedural default. On October 28, 1987, the Georgia Supreme Court denied the application for a certificate of probable cause to appeal. The United States Supreme Court subsequently denied certiorari on March 7, 1988, and denied a rehearing on April 25, 1988.

Petitioner then filed a petition for habeas relief in federal district court on June 23, 1988. The federal petition was denied at the trial level on June 6, 1989, without an evidentiary hearing. Subsequent to the entry of judgment, both Petitioner and the State filed motions to alter and amend. On June 22, 1989, the District Court entered an order denying Petitioner's motion, but did not rule on the State's motion. During the pendency of the State's motion, Petitioner filed a notice of appeal. On August 10, 1990, the Eleventh Circuit dismissed the appeal of Petitioner for lack of jurisdiction. On remand, the District Court entered an order on September 20, 1990, granting the State's motion to alter and amend in part and denying the motion in part.

Petitioner then filed an appeal challenging the decision of the District Court, while at the same time challenging the court's jurisdiction to consider his own appeal due to the failure to rule on an issue. On December 27, 1991, the Eleventh Circuit dismissed the appeal for lack of jurisdiction because the District Court failed to rule on Petitioner's claim regarding the guilt-phase jury, but the Eleventh Circuit did find that the District Court had jurisdiction to hold an evidentiary hearing on Petitioner's . . . claims [Giglio v. United States, 405 U.S. 150 (1972); Brady v. Maryland, 373 U.S. 83 (1963)], and ordered the District Court to hold such a hearing. After an evidentiary hearing on May 18, 1992, the District Court found the Brady/Giglio claims to be procedurally barred, and thereby dismissed the petition on June 23, 1992. The Eleventh Circuit affirmed the ruling on April 14, 1994, and denied a rehearing en bane on July 12, 1994. The United States Supreme Court again denied certiorari on December 12, 1994, and denied a rehearing on February 21, 1995.

Petitioner began a third round of habeas action in the Superior Court of Butts County on December 22, 1994, challenging his new death sentence on two grounds: ineffective assistance of counsel during the re-sentencing trial and ineffective assistance of counsel during the appeal from the re-sentencing trial. The State filed its answer on January 13, 1995. For reasons unknown to the Court, no action apparently occurred in Petitioner's case in the state court system until 1999.

On March 29, 1999, an amended habeas petition was filed in the state court. An evidentiary hearing was conducted in the state habeas court on May 5 and 6, 1999, and Petitioner's claims were denied on December 29, 1999. Petitioner's application for a certificate of probable cause to appeal was denied by the Georgia Supreme Court on January 10, 2002. On October 21, 2002, the United States Supreme Court denied certiorari.

In February 2003, after exhausting these remedies, Alderman once again returned to the district court for habeas corpus relief. In a new petition, he claimed that he was denied constitutionally effective assistance of counsel at his 1984 re-sentencing trial and in his direct appeal from the death sentence he received. The district court, relying on the record compiled by the Superior Court of Butts County on Alderman's March 29, 1999 habeas petition and the court's order denying relief, denied Alderman's petition and his subsequent motion to alter and amend the judgment. In June 2005, we granted Alderman's application for a certificate of appealability on the ineffective assistance of counsel issue set out in the opening paragraph of this opinion.[3]

---

[3]In addition to the claim before us, Alderman asserted that he was denied effective assistance of counsel on his direct appeal from his 1984 re-sentencing trial in violation of the

9

In subpart A, we outline the case that the State presented against Alderman

at his 1984 re-sentencing trial ("RST").  In subpart B, we outline the case

Alderman presented.

A.

At Alderman's RST, the State sought the death penalty on the grounds that

the motive and manner in which Alderman murdered his wife constituted two

aggravating circumstances, each of which independently warranted the death

penalty: (1) he murdered his wife to obtain insurance money, and (2) he committed

the murder in an "outrageously vile" or "inhuman" way.

Addressing the first aggravating circumstance, the prosecutor told the jury

that Alderman deserved the death penalty because he murdered Mrs. Alderman

"for . . . the purpose of receiving [insurance] money."[4]  The prosecutor established

this motive by presenting the testimony of City of Savannah employee, Sandra

---

Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Specifically, Alderman alleged that his counsel failed to include in his brief to the Georgia Supreme Court a claim presented to the trial court, that the State violated his rights under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), by withholding evidence that it had promised John Brown leniency in exchange for his testimony against Alderman.  In Alderman v. Schofield, No. CV403-028 at 26–27 (S.D. Ga. July 16, 2004), the district court found that Alderman's appellate counsel was not ineffective for failing to raise the Brady/Giglio claim on appeal.

[4] The Georgia statutes listed murder committed for oneself or another for the purpose of receiving money or any other thing of monetary value as a circumstance that, upon a jury's finding, authorized the jury to return a verdict of death. GA. CODE ANN. § 17-10-30(b)(4) (1984).

Sullivan. Sullivan, the City's personnel technician who handled employee benefits and records in September 1974, testified that Mrs. Alderman was employed by the City at the time of her death and explained that, as a City employee, Mrs. Alderman participated in the City's group life insurance policy. The prosecutor produced a copy of the City's group policy, which provided for a death benefit commensurate with salary—up to $10,000—with double indemnity upon accidental death. He also offered a copy of Mrs. Alderman's enrollment card for the City's group policy, which listed Alderman as the sole beneficiary. Sullivan also testified that at the time of Mrs. Alderman's death, her salary qualified her for the maximum $10,000 death benefit, which would double to $20,000 in the event of accidental death.

The prosecutor used John Brown to cement his theory that Alderman killed his wife for the insurance benefits.[5] Brown testified that in the days preceding Mrs. Alderman's death, Alderman enlisted him in a plot to kill her. Brown said that Alderman promised him half of the insurance money for his role in the

_____

[5]Brown testified at Alderman's 1975 trial while under indictment for Mrs. Alderman's murder and awaiting his own trial. Brown was convicted less than six months after Alderman's conviction. Sentence of the Court, State v. Brown, No. 23499 (Super. Ct. of Chatham Co. Dec. 4, 1975). The jury convicted Brown of murder, and their verdict called for the death penalty. Id. While the court sentenced Brown to death in 1975, it granted a new trial on the sentencing phase and re-sentenced Brown to life imprisonment on December 4, 1978. Order of the Court, State v. Brown, No. 23499 (Super. Ct. of Chatham Co. Dec. 4, 1978). He was serving that sentence of life imprisonment when he testified at Alderman's RST.

11

murder.[6]

Regarding the second aggravating circumstance, the prosecutor urged the jury to invoke the death penalty because the "offense of murder . . . was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim."[7] Brown provided the State's only evidence on this point. His testimony painted a picture of what the prosecutor termed an "[e]xecution type [sic] killing."

Brown recounted the events of the night of Mrs. Alderman's death. Brown said that when he came over to Alderman's apartment that evening, Alderman had him follow Mrs. Alderman around the apartment with a wrench in his hand. Brown struck Mrs. Alderman in the back of her head with the wrench. Alderman then got Mrs. Alderman on the floor and held his hand over her nose and mouth so that she could not breathe. The two men then took Mrs. Alderman to the bathroom tub and filled it with water. Alderman held her head under water. The two men then left her there and headed to the local bar for a few drinks. Upon their return to

---

[6] John Brown also testified that Alderman wanted to kill his wife because she "was wanting a divorce from him and . . . was going to take him through the mill," which Brown explained to mean "that she was going to take everything he had." In addressing the jury, however, the prosecutor did not argue that Alderman killed his wife because she was planning to divorce him.

[7] Under Georgia law, this aggravating circumstance also authorized the imposition of the death penalty. GA. CODE ANN. § 17-10-30(b)(7) (1984).

the apartment two hours later, Brown and Alderman put Mrs. Alderman's body in the trunk of the Aldermans' car and drove the car to a creek that was on the way to Mrs. Alderman's grandmother's house. They then put Mrs. Alderman's body in the driver's seat, rolled down the windows, put the gear in neutral, and sent the car into the creek to make it look like an accident.

## B.

Alderman countered the State's case by showing that Brown had a better motive for killing Mrs. Alderman than he did, and that Brown had confessed to a fellow jail inmate that he had, in fact, committed the murder. Put another way, Alderman's attorneys pursued a lingering or residual doubt theory as to whether Alderman murdered his wife and, in doing so, gave the jury a basis for returning a verdict of life imprisonment instead of the death penalty. Counsel felt that the lingering doubt theory was the appropriate strategy because a new jury had been empaneled for the RST, the jury that convicted Alderman in 1975 having been discharged. If successful, the lingering doubt strategy would yield a sentence of life imprisonment instead of death.[8]

In carrying out this strategy, counsel focused on the inconsistencies in the

---

[8] Alderman's lawyers explained their strategy in considerable detail at the May 5-6, 1999 evidentiary hearing the Butts County Superior Court held on Alderman's petition for a writ of habeas corpus.

State's case, asking in their opening statement (after the State rested its case) and again in closing argument that the jury not sentence Alderman to death because there was considerable doubt as to whether he had committed the crime.  They supported this strategy with an alternative theory of how the murder occurred: Brown acted alone and killed Mrs. Alderman for drug money.

Defense counsel proceeded with Alderman's defense as follows (each category to be discussed in greater detail, infra).[9]  First, they planted the seeds of their lingering doubt theory by impeaching Brown's credibility – his story about what motivated Mrs. Alderman's murder and how it occurred.  They accomplished this principally through their cross-examination of Brown while he was on the witness stand in the State's case.  Then, they put on witnesses who said that Alderman's reputation (in 1974) for being a law-abiding citizen was good – such that it would have been completely out of character for Alderman to have murdered his wife – and that his reputation for truthfulness (in 1974 or at the time of the RST) was beyond reproach.[10]  Counsel elicited testimony of Alderman's

---

[9] Defense counsel presented the testimony of 30 witnesses, including Alderman.  The testimony of six of them came in the form of transcripts of testimony they had given at Alderman's 1975 trial.  These transcripts were read to the jury.  As for the live witnesses, they did not testify in the precise order implied in the text following this footnote.  For convenience, however, we discuss each witness's testimony in relation to the purpose for which it was introduced, irrespective of the actual order of the testimony at the RST.

[10] The State challenged the credibility of Alderman's testimony at the 1975 trial and at the RST.  The 1975 testimony was before the RST jury via the State's impeachment of some of

14

reputation for telling the truth because he would be their final witness, and the jury would have to believe him if they were to have a lingering doubt as to his guilt.

After calling these "reputation" witnesses, counsel presented evidence – mainly through the testimony of Alderman's father – about Alderman's upbringing and the struggles Alderman had to overcome to become a productive member of society. Counsel added to this the testimony of those monitoring Alderman's prison behavior; they said that Alderman was a model prisoner who posed no threat to the safety of fellow inmates or prison personnel, thus implying that the jury need not sentence him to death to protect those in prison. With all of this testimony before the jury, counsel called Alderman to the stand.

1.

Because the State's case hinged principally on Brown's testimony, defense counsel went all out in an effort to destroy Brown's credibility. To that end, counsel portrayed Brown as a lying drug addict. Counsel questioned Brown at great length about his heavy use of alcohol and illegal drugs. Brown conceded that he went through about four fifths of whiskey per week and smoked as much as an ounce of marijuana per day. He also admitted to taking barbiturates by the handful and using speed, LSD, opium, and qualudes.

the testimony Alderman gave from the witness stand at the RST.

While presenting Alderman's case, counsel read to the jury a transcript of an interview that an agent of the Georgia Bureau of Investigation conducted with Brown wherein Brown admitted that he was intoxicated at the time he helped Alderman kill his wife. Brown also admitted that he experienced sporadic flashbacks on account of his LSD use. During these flashbacks, he would blackout, hallucinate, and generally have no recollection of what he did during the flashback. Brown acknowledged, moreover, that during his trip back to the United States from military service in Vietnam, he removed from his medical records, which had been entrusted to him, references to his frequent blackouts, inability to control himself, and inability to remember his actions during blackouts.

In addition to portraying Brown as having extreme difficulty remembering critical events, Alderman's defense counsel countered Brown's description of how the murder occurred. First, they presented the testimony of a man, Robert S. Walters, who occupied the same cell block that Brown did in December 1974, while Brown was under indictment and awaiting trial for the Alderman murder.[11] Walters testified that Brown gave him three different versions of how Mrs. Alderman died. In the first version, Alderman forced Brown to kill her by

---

[11] Walters took the stand "out of order," after most of Alderman's character witnesses had testified. We relate what he said here, in this part of the opinion, because his testimony bore solely on Brown's credibility. See supra note 9.

threatening him with a knife. In the second version, Alderman threatened Brown with a gun. In the final version, Brown recounted how he alone killed Mrs. Alderman – without reference to any involvement on the part of Alderman. In that account, Brown told Walters that he and Mrs. Alderman had been "having an affair and that he needed money for dope and that him and her [sic] got into an argument and from that argument he picked up a wrench and hit her and then put her in the trunk of the car and drove her out to the creek."

The second way in which defense counsel countered Brown's description of the murder was to present the testimony of Dr. Sandra Conradi, a forensic pathologist. In his testimony in the State's case, Brown said that Alderman put his wife on the floor and held his hand over her mouth and nose so she could not breathe. She became unconscious. He then helped Alderman take her to the bathroom where she was placed in the tub and drowned. Dr. Conradi testified that her examination of Mrs. Alderman's autopsy report, the transcript of the 1975 trial testimony of the Director of the Chatham County Branch of the State Crime Lab, and various other documents indicated that there was no strangling, choking, squeezing of the nose, or any other sign of struggle with Mrs. Alderman prior to her death.

2.

Several witnesses portrayed Alderman as a man incapable of the act John Brown and the State accused him of committing and as a person with unimpeachable veracity. The pastor of the Aldermans' church, members of that church, neighbors, and former co-workers testified that Alderman had a reputation in the community for being law-abiding and truthful.[12] They described him as a hard-working man of good character. Alderman's pastor, Rev. Jesse W. Hilton, a Baptist minister who baptized Alderman, also told of the Aldermans involvement in his church; they were active in not just one, but in all of the church's ministries. A Catholic chaplain, Father Richard Paul Wise, who had considerable interaction with Alderman in the prison setting, echoed the pastor's sentiments, adding that Alderman was one of the most honest people he had ever met in prison work.

3.

Alderman's father described his son's childhood and upbringing.[13] He and his wife divorced when Alderman was three years old. Following the divorce, he took Alderman and his younger sister to live with their paternal grandmother and

---

[12] These witnesses testified as to Alderman's reputation for truthfulness at the time of his 1975 trial. Such reputation was relevant because Alderman testified at that trial and portions of the transcript of his testimony were used by the prosecutor at the RST to impeach him.

[13] When he subsequently took the witness stand, Alderman repeated much of what his father had said about his upbringing and the problems he encountered and overcame following the damage to his left eye.

step-grandfather.

The father told how Alderman lost his left eye and the impact that had on his son's development.  At the age of four, Alderman was fishing with his grandmother and step-grandfather when he accidentally stabbed himself in the left eye with a fishing knife.[14]  Following surgery and his release from the hospital, a child hit him in the same eye with a hacksaw blade, which left him blind in that eye.  Despite this handicap, Alderman's father recounted that when his son was "in the fifth grade, he had already [gone] through the sixth grade books and . . . his teacher and the principal wanted him to skip the sixth grade."  A sympathetic blindness, "optical neuritis," began to develop in Alderman's functional eye, however, and Alderman lost so much vision that he could not see or write.  As a result, he was sent to the Georgia Academy for the Blind in Macon.  He stayed there through his junior year of high school, excelling academically.

While at the academy, Alderman was hospitalized on three occasions for eye surgery.  The first surgery was experimental to reduce inflamation.  The last surgery was performed to remove the eye so a prosthesis could be implanted.

---

[14]  A psychiatrist, Dr. Herbert Smith, who examined Alderman following his indictment for Mrs. Alderman's murder and testified at Alderman's 1975 trial, described what thereafter occurred in these words: "[A]fter several operations he was released from the hospital and as fate would have it, a . . . mentally retarded child . . . stuck a hacksaw blade in the same eye that very day and ripped out most of the cornea, iris, and pupil, leaving him totally blind in that eye."  A transcript of the psychiatrist's entire testimony was read to the jury as part of Alderman's case at the RST.

Meanwhile, the sight in his right eye improved enough to enable him to transfer to Savannah High School for his senior year. His performance during that year so impressed his high school counselor that she recommended him to an employer who was looking for a student to train in its business.

Alderman's father concluded his direct-examination by saying that he loved his son, that he visited him at the prison "a couple of times," and that he "wanted to go more, but [his] health wouldn't permit it."

4.

Operating under the assumption that their lingering doubt strategy might fail, defense counsel sought to avoid the death penalty by convincing the jury that Alderman would pose no threat to the safety of fellow prison inmates and people working at the prison. To this end, they presented the testimony of eleven prison guards. All said that Alderman was a model prisoner. They described him as a committed Christian who frequently assisted them in caring for fellow inmates. Although they did not say so explicitly, they clearly implied that his execution was not necessary for the protection of inmates and those working in the prison facility.

5.

Counsel presented Alderman as their final witness. Their direct examination was tailored to the lingering doubt theory they had set before the jury in their opening statement. Alderman described his relationship with his wife and his whereabouts on the night of her death, a description that stood in sharp contrast to what Brown had told the jury. Alderman testified that he and Mrs. Alderman had a fight that day regarding their inability to conceive a child. Both were considerably upset, so he left their apartment for a while. Upon his return, he found that she was not there. Thinking that she had gone to her grandparents' house,[15] he began driving there. About a half a mile from their house, he saw a car partially submerged in a creek and decided to investigate. Upon closer inspection, he recognized the car as his own. In the car, he found his wife's body. Alderman said that from the time he discovered her body in the creek until he identified her body at the hospital, he had no memory of his actions or any awareness of her death.[16]

To bolster this statement, Alderman's counsel read to the jury a transcript of the testimony Dr. Herbert Smith, a psychiatrist, had given at his trial in June of

---

[15] The Aldermans lived in the same town as Mrs. Alderman's grandparents before moving to the Savannah apartment where they were living at the time of Mrs. Alderman's death.

[16] After Dr. Smith treated Alderman in June 1975, Alderman was able to recall fragments of the events that transpired between the time he discovered his wife's body in the creek and the moment he identified it at the hospital.

1975.  Dr. Smith had examined Alderman a month or so before his trial to determine the cause of Alderman's lack of memory at such a critical point in time. He opined that Alderman suffered from a "selective amnesia [that was] probably secondary to disassociative reaction," and that upon seeing his wife's body in the creek, he "was emotionally upset, suffering from shock and disbelief, and overwhelmed with grief."  Alderman then heard a car approaching and assumed that because he was so close to the grandparents' house, the car probably contained her relatives.  He reasoned that "if they saw him there they would jump to the conclusion that he was responsible and they would hurt him physically," as "they had threatened to do . . . in the past."

Dr. Smith then explained how "the mechanisms of fight or flight went into operation and [Alderman] fled the scene to avoid what he considered almost certain physical harm."  To keep from "feeling unmanly and cowardly" about leaving his wife there, Alderman experienced a disassociative reaction.  The part of his consciousness that knew he had discovered his wife "was split off from the rest of it and . . . repressed into the unconsciousness.  This created a disassociative reaction and along with it the amnesia."  This, in turn, enabled Alderman to "subconsciously deny that he had found his wife's body and therefore deny that she was actually dead at all, so that he did not have to feel guilty about leaving his

22

wife and he would also be able to escape the terrible fear of physical harm by his in-laws." Dr. Smith said that Alderman's amnesia "lasted from the time he spotted his wife's body in the creek until the time he identified [her] body at the hospital."

Responding to the State's theory that he killed his wife to collect insurance proceeds, Alderman testified that he and Mrs. Alderman had a good marriage and that he had no more monetary incentive to kill his wife than any other husband whose wife had life insurance.[17] Contrary to Brown's story, Alderman testified that his wife was not contemplating a divorce. Alderman said that he and Mrs. Alderman had a normal, healthy marital relationship.

Alderman's lawyers thus impugned John Brown's credibility, and therefore the State's theory of the case, by portraying Brown as a lying drug-addict, and offering his own, exculpatory version of events.

**III.**

In his habeas petition to the Butts County Superior Court on December 22, 1994, Alderman claimed that his attorneys denied him the effective assistance of counsel by failing to investigate and present to the jury his social-history

---

[17] Prior to her death, Mrs. Alderman's insurance with the City of Savannah had lapsed. As the state habeas court stated in its order denying Alderman relief, defense counsel "presented witnesses who testified that, if any life insurance policies had existed at the time of the murder, they had lapsed prior to Mrs. Alderman's death." Alderman v. Head, No. 94-V-720 at 22 (Super. Ct. of Butts County Dec. 29, 1999). The State's insurance motivation for the murder therefore depended solely on the testimony of John Brown.

23

background.  The heart of his claim was that his "counsel's failure to investigate, develop and present mitigating evidence beyond lingering doubt evidence was not the result of a tactical or strategic decision.  Rather it was the result of a complete failure to understand the meaning, purpose and scope of mitigation evidence at a capital sentencing trial."

The superior court held an evidentiary hearing on the petition on May 5–6, 1999.  Alderman's habeas attorneys examined six witnesses: Father Richard Paul Wise, Catherine Thompson, Martha Murphy Davis, Jack Boyd Deal, George Terry Jackson, and Michael Schiavone.  Father Wise was the chaplain at the Georgia Diagnostic and Classification Center from 1980–1986, and came to know Alderman while he was on death row there.   Father Wise, who had testified as a defense witness at the RST, complained that he "didn't get a chance to say what [he] wanted to say."[18]  He remembered, however, being asked his opinion of Alderman and commenting that "he was probably one of the most honest people [he had] met in prison work." Catherine Thompson, Alderman's ex-wife, stated that while she testified as a defense witness at Alderman's 1975 trial, she was not asked to testify at his RST.  Thompson would have testified that Alderman never

---

[18]  At the habeas corpus hearing, Father Wise expressed that "Jack always impressed me. . . [He] was probably the most influential person that I knew back there [at the D-house].  I respected Jack's wisdom."  Father Wise testified that he felt frustrated at not being able to elaborate more on these opinions at the RST.

24

abused her, and that she had "never seen him get in any kind of arguments, fights . . . that wasn't his nature." Similarly, Martha Murphy Davis, a Presbyterian pastor and director of the Southern Prison Ministry in Georgia, averred that she did not testify at Alderman's RST but would have been willing to do so.[19] Alderman's lawyers at the evidentiary hearing also called Jack Boyd Deal, a retired high school teacher who taught Alderman at Savannah High School in 1968 and 1969. Deal said that he was not contacted to serve as a defense witness at the RST, but if given the chance to testify he would have described Alderman as a model student who "got along well with his peers and his other teachers."

The crux of the evidentiary hearing focused on the testimony of Alderman's attorneys, George Terry Jackson and Michael Schiavone. In terms of experience, Jackson had been a practicing attorney for twelve years, and had handled several death penalty cases, some of which went to trial, by the time he was appointed to represent Alderman. In light of his experience in capital cases, Jackson was writing articles and speaking at seminars regarding death penalty litigation. Jackson occupied the first chair, and Schiavone was the second chair at Alderman's RST.

---

[19] Davis testified that she would have commented on Alderman's physical, spiritual, and intellectual discipline had she been called to testify at the RST: "Jack has stood out in many ways . . . his capacity . . . through all that he's been through . . . to maintain a sense of focus and an amazing level of discipline."

At the RST, Jackson was primarily responsible for preparing witnesses on the lingering doubt theory, and Schiavone mainly organized the mitigation evidence. Jackson testified that while lingering doubt was their primary defense to the death penalty, they also wanted "to show what kind of person Jack Alderman was, that he was well respected in the community and trusted." Jackson explained that their character witnesses were questioned at the RST about Alderman's reputation in the community for being a truthful, law abiding citizen, and that there was no tactical reason for not asking them about Alderman's life and background. Jackson also said that he did not have a particular reason for not having Alderman's ex-wife testify or introducing portions of Alderman's medical and educational records.

Jackson testified that he hired two investigators to locate a number of witnesses. In particular, he was interested in determining the whereabouts of Jon Sato. Sato and Brown were housed in the same cellblock following Brown's conviction in 1975. Sato gave a taped, sworn statement to his attorney describing how Brown had confessed to committing the murder alone, without Alderman's involvement. Prior to the RST, Sato and the tape disappeared. Jackson described the lengths the defense team went to in an attempt to secure Sato's testimony. They discovered Sato but only after the jury had returned its verdict against

26

Alderman and he had been sentenced. Jackson also discussed his decision to call Dr. Conradi as a defense witness. While Dr. Conradi was not part of the defense's case at the 1975 trial, Jackson wanted to emphasize the absence of the physical findings that should have been present on Mrs. Alderman's body had Brown been telling the truth.

As for mitigating evidence, Jackson and Schiavone called as character witnesses eleven corrections officers, seven of Alderman's friends, and five of Alderman's previous employers or co-workers.[20] Schiavone testified that "[he] wanted background information about Jack and about his family and things of that nature. You know, my recollection is that even though it was a re-sentencing hearing the main thrust of our approach was that – was to prove Jack's innocence, that they shouldn't put an innocent man to death." When asked whether he had a strategical reason for not inquiring into the details of Alderman's "life experiences," Schiavone responded that there was "no tactical or strategic reason I can think of, just probably didn't ask them."[21] Upon further inquiry, Schiavone said: "we probably were thinking that [the reputation evidence] was the extent that we could go into at the time."

_____

[20] See supra part II.B.4.

[21] It is apparent from the record that Schiavone was referring to Alderman's friends, who testified to his reputation as being a law-abiding and truthful person. See supra part II.B.2.

On December 29, 1999, the Butts County Superior Court denied Alderman's petition for writ of habeas corpus. After discussing Jackson and Schiavone's representation of Alderman, the court found that "trial counsel brought 'to bear such skill and knowledge as will render the trial a reliable adversarial testing process.'" Alderman v. Head, No. 94-V-720 at 20 (Super. Ct. of Butts County Dec. 29, 1999) (citing Strickland v. Washington, 466 U.S. 668, 688 (1984)). The court further found that defense counsel's "strategy to show 'residual doubt,' was a reasonable, professional decision in light of the information and facts that were available to trial counsel at the time." Id.

> As the jury at the re-sentencing trial was not the same jury who found Alderman guilty of the crime, there was a possibility that this jury, who heard the entire guilt/innocence evidentiary presentation, would believe that some doubt existed as to Alderman's guilt. It was reasonable for Mr. Jackson to believe that presenting evidence that Alderman's mother had left the family when he was a child and evidence about his vision problems would not sway a jury to impose a life sentence instead of death. In fact, in order to effectively present a penalty phase defense of mercy based on sad circumstances of his childhood and adolescence, Alderman may have had to admit to committing the crime and then ask the jury to spare him the death penalty due to his difficult childhood. Because Alderman maintained his innocence throughout the first trial and the re-sentencing trial, such a strategy would have been incompatible with his testimony; therefore, the residual doubt strategy used by Mr. Jackson was a reasonable one based on the facts and circumstances as Mr. Jackson knew them to be at that time.

Alderman v. Head, No. 94-V-720 at 23 (Super. Ct. of Butts County December 29,

28

1999).[22]

In response to the claim that his attorneys failed to conduct an adequate pretrial investigation of Alderman's life history, the court found that counsel thoroughly investigated Alderman's background with the aid of two investigators. The court also rejected the claim that counsel failed to understand the scope of available mitigating evidence, and thus failed to present sufficient evidence in mitigation. The court found that Alderman's attorneys presented "substantial" mitigation evidence. Id. at 25. In sum, the court concluded that "Alderman has failed to establish that he received ineffective assistance of counsel under either prong of the Strickland standard and relief on this claim is denied on the merits." Id. at 30.

**IV**.

Alderman challenges the Butts County Superior Court's findings of fact and conclusions of law on the ground that both are unreasonable under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. §

---

[22] A reading of the quoted portion of the superior court's decision might convey the impression that defense counsel did not present "evidence that Alderman's mother had left the family when he was a child and evidence about his vision problems." As our discussion in part II.B.3 indicates, counsel did present such evidence through the testimony of Alderman's father and Dr. Smith, the psychiatrist, who testified for the defense via a transcript of the testimony he gave at Alderman's 1975 trial. Given this reality, and as we point out in the text infra, what the court obviously meant in the above quotation is that defense counsel did not present Alderman's life history to the extent habeas counsel contend they should have.

2254(d). Because the state court adjudicated his habeas corpus claim on the merits, we can grant his application for a writ of habeas corpus only if that court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[23] Accordingly, for Alderman to secure federal habeas corpus relief, he must demonstrate that his case satisfies the conditions set forth in either § 2254(d)(1) or §2254(d)(2).[24]

Specifically, the Supreme Court provided guidance about how to interpret § 2254(d) in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000). Under section 2254(d)(1), the "contrary to" and "unreasonable application" clauses are interpreted as independent statutory modes of analysis.

---

[23] "Section 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act, Pub.L. No. 104-132, 110 Stat. 1218 (1996), establishes a more deferential standard of review of state habeas judgments." Fugate v. Head, 261 F.3d 1206, 1215 (11th Cir. 2001).

[24] In addition to section 2254(d), 28 U.S.C. § 2254(e)(1) provides that "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." This section refers to the petitioner's burden in federal district court to overcome the state court's fact finding by "clear and convincing evidence." Since we ultimately conclude that Alderman does not satisfy the conditions set forth in either § 2254(d)(1) or §2254(d)(2), we need not address the application of § 2254(e) in this case.

See Williams, 529 U.S. at 405–407, 120 S. Ct. at 1519–1520. Williams held that there are two ways in which a state-court decision may be "contrary to" Federal law:

> "First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours."

529 U.S. at 405, 120 S. Ct. at 1519 (O'Connor, J., for majority). However, Williams does not limit the construction of "contrary to" to the two examples set forth above. Section 2254(d)(1)'s "contrary to" simply implies that "the state court's decision must be substantially different from the relevant precedent of this Court." Id.

Alternatively, when the federal court is faced with a "run-of-the-mill state-court decision applying the correct legal rule," the companion "unreasonable application" provision of § 2254(d)(1) is the proper statutory lens. 529 U.S. at 406, 120 S. Ct. at 1520. In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established

federal law was <u>objectively</u> unreasonable." 529 U.S. at 409, 120 S. Ct. at 1521 (emphasis added).

In addition to § 2254(d)(1), § 2254(d)(2) regulates federal court review of state court findings of fact; the section limits the availability of relief to "decision[s] that w[ere] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). Finally, § 2254(d) provides the framework for granting habeas corpus relief in situations where the federal court has found constitutional error. <u>See</u>, <u>e.g.</u>, <u>Wiggins v. Smith</u>, 539 U.S. 510, 528, 123 S. Ct. 2527, 2539, 156 L.Ed.2d 471 (2003); <u>Taylor v. Maddox</u>, 366 F.3d 992, 999–1001 (9th Cir. 2004), <u>cert.</u> denied, 543 U.S. 1038, 125 S. Ct. 809, 160 L.E.2d 605 (2004).

<u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984), establishes the test that governs claims of ineffective assistance of counsel, i.e., the "clearly established Federal law" relevant to this case under 28 U.S.C. § 2254(d). The petitioner must satisfy <u>Strickland's</u> two-part test to mount successfully an ineffective assistance of counsel claim. 466 U.S. at 687, 104 S. Ct. at 2064. In other words, the petitioner must show both 1) deficient performance of counsel <u>and</u> 2) prejudicial impact stemming from counsel's deficient performance. <u>Id.</u> Under the first prong, the petitioner must show "that

32

counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. The hallmark of the second prong is reliability: "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.

When assessing whether counsel fulfilled their obligations under Strickland, the Supreme Court has "focus[ed] on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [petitioner's] background was itself reasonable." See, e.g., Wiggins v. Smith, 539 U.S. 510, 523, 123 S. Ct. 2527, 2536, 156 L.Ed.2d 471 (2003) (concluding that counsel's decision not to expand their investigation beyond three sources fell short of the required professional standards). Furthermore, in evaluating the reasonableness of the investigation, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 527, 123 S. Ct. at 2538.

This is not to suggest that there is some latent magic number of witnesses to interview or documents or exhibits to review. On the contrary, there is "no absolute duty to investigate particular facts or a certain line of defenses." Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (noting that "a complete failure to

33

investigate may constitute deficient performance of counsel in certain

circumstances"). Rather than scrutinizing counsel's performance through the

narrow lens of hindsight, the court must consider "the sum total of [counsel's]

efforts." Id. at 1240. Furthermore, there is not one "correct" way for counsel to

provide effective assistance.

> To uphold a lawyer's strategy, we need not attempt to divine the lawyer's mental processes underlying the strategy . . . No lawyer can be expected to have considered all of the ways. If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on . . . our inquiry is limited to whether this strategy . . . might have been a reasonable one.

Chandler v. U.S., 218 F.3d 1305, 1316 n.16 (11th Cir. 2000).

Even if the petitioner claims that his attorney was unaware of a relevant

defense, "petitioner must prove that the approach taken by defense counsel would

not have been used by professionally competent counsel." Harich v. Dugger, 844

F.2d 1464, 1470 (11th Cir. 1988) (abrogated on other grounds). As Strickland

emphasized, "a court must indulge a strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance; that is, the

defendant must overcome the presumption that, under the circumstances, the

challenged action 'might be considered sound trial strategy.'" 466 U.S. at 689

(citing Michel v. Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158, 164, 100 L.Ed. 83

34

(1955)).

Here, Alderman contends that the state habeas court unreasonably applied Strickland's standard as to the deficient performance prong of his ineffectiveness claims. Alderman maintains that under Strickland, his attorneys' failure to investigate life-history mitigation evidence was reasonable only if counsel made an informed strategic decision to forego such an investigation. In this regard, Alderman questions the state habeas court's determination that counsel's presentation of lingering doubt evidence effectively precluded a finding of deficient performance.

Alderman further claims that the state habeas court's decision should be disregarded because the court based its decision on unreasonable determinations of fact in light of the evidence before the court. He contends that the record clearly establishes that his attorneys did not make a strategic or tactical decision to forego presenting life-history mitigation evidence, but instead misunderstood the law regarding mitigation evidence, i.e., they believed that the only evidence the law permitted them to present was testimony concerning his reputation in the community for being law abiding and truthful. Alderman emphasizes Jackson's statement at the evidentiary hearing that the mitigation evidence Alderman's habeas attorneys proffered was not inconsistent with the lingering doubt theory

35

that counsel adopted at the RST.

We conclude that the state court's application of Strickland was not objectively unreasonable, and that defense counsel's life-history investigation and presentation of mitigating evidence did not constitute ineffective assistance of counsel under Strickland. We also conclude that defense counsel's failure to present the evidence habeas counsel proffered at the evidentiary hearing did not constitute an error so "serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

Counsel was not required to examine every possible legal strategy or defense available. Strickland focuses on whether the investigation supporting counsel's decision was itself reasonable. Contrary to Alderman's view, the state court determined that counsel conducted a thorough background investigation with the aid of two investigators, presented substantial evidence in mitigation, and had a reasonable trial strategy. As the court stated, "trial counsel's strategy to show 'residual doubt' was a reasonable, professional decision in light of information and facts that were available to trial counsel at the time." Alderman v. Head, No. 94-V-720 at 20 (Super. Ct. of Butts County Dec. 29, 1999).

Furthermore, Alderman's claim that counsel needed to make a strategic decision to forego a life-history investigation to satisfy Strickland presupposes

36

that counsel did not in fact make such a decision. At trial, through the testimony of Alderman, his father, and Dr. Smith, counsel elicited an account of Alderman's upbringing: Alderman did not remember his mother at all; the challenges he faced due to his eye injury and subsequent blindness; and the year that he spent away from his family while at the Georgia Academy for the Blind. In addition, defense counsel elicited his father's testimony of love for his son.

Notwithstanding counsel's presentation of such mitigating evidence, Alderman contends that the state court's finding that defense counsel presented "substantial" mitigating evidence constitutes an unreasonable determination of fact in light of the evidence before the court. Specifically, he contends that his attorneys did not, and could not, make a strategic or tactical decision to forego presenting life-history mitigation evidence, because they misunderstood what the law would permit as mitigating evidence. According to Alderman, counsel thought that the only evidence the court would permit to come before the jury in mitigation would be what is traditionally referred to as "character" evidence.[25] That is, the court would allow witnesses to testify about Alderman's good

_____

[25] "Character witnesses testifying on behalf of the accused are limited on direct examination to stating that the defendant's reputation in the community is good. The witness may not give his personal opinion of the accused's character, or relate specific instances of conduct that illustrate the defendant's good character." Paul S. Milich, Courtroom Handbook on Georgia Evidence § 11.4 (2006 ed.) (citations omitted). A witness may also testify as to the accused's reputation for truth and veracity where the accused's credibility is at issue. Id.

reputation in the community, but not his difficult childhood and the hurdles he faced as a result of his eye injury. Alderman bases his assertion on Schiavone's testimony. When asked whether he had a tactical reason for not presenting the details of Alderman's life history, Schiavone responded that there is "no tactical or strategic reason I can think of, just probably didn't ask them." Alderman v. Turpin, No. 94-V-720, Evidentiary Hr'g at 256 (Super. Ct. of Butts County May 21, 1999).[26] Upon further inquiry, Schiavone speculated that they "were thinking that [the character evidence] was the extent that we could go into at the time." Id. at 257. Alderman seizes upon this statement as proof that Schiavone and Jackson believed that they were limited in their presentation of mitigating evidence.

These responses must be viewed, however, in light of both Schiavone's guidance to the character witnesses and the mitigating evidence counsel actually presented to the jury. For example, Schiavone commented on what he told the character witnesses in preparing them to testify: "I mean I assume I wanted background information about Jack and about his family and things of that nature . . . my recollection is that even though it was a re-sentencing hearing the main thrust of our approach was that – was to prove Jack's innocence, that they

---

[26] As noted in Alderman v. Head, No. 94-V-720 at 20 (Super. Ct. of Butts County Dec. 29, 1999), Fredrick J. Head, rather than Tony Turpin, was the warden of the Georgia Diagnostic and Classification Prison at the time of the superior court's order denying Alderman habeas relief, and thus was the proper respondent in the case.

shouldn't put an innocent man to death." Furthermore, it would be inaccurate to sever Schiavone's statement from the testimony the jury actually heard regarding Alderman's social-history background. As related above, the jury heard about Alderman's childhood, eye injury, subsequent blindness, year away from the family, and the father's love. Significantly, upon reviewing this testimony, the state court, in making its credibility choices and finding the salient facts, had the authority to discredit Schiavone's statement – that defense counsel believed that the law limited mitigation evidence to "character" evidence – and to find, as it did, that "trial counsel brought 'to bear such skill and knowledge as will render the trial a reliable adversarial testing process.'" Alderman v. Head, No. 94-V-720 at 20 (Super. Ct. of Butts County Dec. 29, 1999).[27]

The state habeas court was not unreasonable in deciding that Alderman's lawyers made a strategic decision to forego the presentation of life-history evidence as fully as Alderman's habeas counsel claims the Constitution requires. Under § 2254(d)(2), there is nothing in the record to suggest that the state court engaged in unreasonable determinations of fact. Considering Jackson and Schiavone's testimony as a whole, and the over-arching "lingering-doubt" strategy

_____

[27] It is apparent to us that the court considered Schiavone's testimony as a whole and disregarded the statement Alderman seizes upon for his claim that counsel felt that the presentation of traditional character evidence was as far as they could go in introducing mitigating evidence.

counsel employed, we cannot say that the state court based its decision on unreasonable determinations of fact in light of the evidence before it.

Often inherent in the choice to pursue one strategy is a latent decision not to engage in a different tactic or line of defense. While Schiavone responded that he could not think of a tactical reason for not pursuing more detailed responses from his witnesses about Alderman's life history, that is simply a reflection of the cardinal emphasis on the lingering doubt strategy. Even assuming that his attorneys were not fully aware of the scope of permissible mitigating evidence, Alderman would need to show that the approach they ultimately took "would not have been used by professionally competent counsel." Harich v. Dugger, 844 F.2d 1464, 1470 (11th Cir. 1988) (abrogated on other grounds). Given the state court's findings regarding counsel's skill, knowledge, and performance, coupled with the court's finding that "counsel performed both reasonably and effectively in their representation of Alderman," Alderman v. Head, No. 94-V-720 at 30 (Super. Ct. of Butts County Dec. 29, 1999), we cannot say that Alderman was denied his constitutional right to competent representation.

Addressing Strickland's second prong, prejudice, the state habeas court concluded that defense counsel's failure to introduce life-history evidence to the extent habeas counsel contend the Constitution requires caused Alderman no

40

prejudice.  The district court, reviewing that conclusion, agreed.  Assuming, for the sake of argument, that counsel's performance failed to meet <u>Strickland</u>'s first prong, we readily conclude on the record before us that "counsel's errors were [not] so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  466 U.S. at 687, 104 S. Ct. at 2064.

The judgment of the district court is accordingly **affirmed.**

**SO ORDERED.**