[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT 17, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-11393

_____

D. C. Docket No. 01-00777-CV-CB-C

HERBERT WILLIAMS, JR.,

Petitioner-Appellant,

versus

COMMISSIONER RICHARD F. ALLEN,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(September 17, 2008)

Before BIRCH, DUBINA and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Herbert Williams, Jr., was convicted of capital murder for the 1988 killing of

Timothy Hasser. An Alabama jury recommended by a vote of 9-3 that Williams be sentenced to life imprisonment without parole, but the trial judge overrode that recommendation and sentenced Williams to death. Following the completion of state postconviction proceedings, Williams filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Williams now appeals the district court's denial of that petition, arguing (1) that he was denied the effective assistance of counsel as to the penalty phase of his trial; (2) that the district court erred in finding his *Batson v. Kentucky* claim unexhausted; and (3) that the district court improperly denied him an evidentiary hearing. After thorough review of the record, we affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

### A. The Crime and Its Investigation

On November 2, 1988, Officer Mark Harrell of the Jackson, Alabama police department observed a white Porsche stopped in the emergency lane on the McCorquodale Bridge, approximately 80 miles north of Mobile. Officer Harrell stopped to provide assistance. The driver, nineteen-year-old Herbert Williams, Jr., told Harrell that he thought the car was running out of gas or was "a lemon," and asked the officer where a gas station was located. Officer Harrell followed Williams to a nearby station and became suspicious when he noticed a substance

2

that appeared to be blood dripping from the vehicle's rear hatch. The officer also observed that Williams was having difficulty operating the vehicle because of its manual transmission.

Upon arriving at the gas station, Officer Harrell looked inside the Porsche and saw the blood-covered body of a white male lying in the back of the vehicle. Officer Harrell placed Williams in the back of his patrol car and returned to the Porsche, where he determined that the victim, later identified as Timothy Hasser, was deceased. Hasser had been shot in the head three times, and weights were tied to his ankles. After additional investigation, it was determined that Hasser was the owner of the Porsche. Officer Harrell read Williams his *Miranda* rights and placed him under arrest. Subsequently, Williams informed the police that a .38 caliber handgun containing his fingerprints was located under the front seat of the Porsche. This gun was later identified as the murder weapon.

B.    *Trial and Direct Appeal*

1.    *Guilt Phase*

Williams was indicted for murder in the course of a robbery in violation of Ala. Code § 13A-5-40(a)(2) (1975). After Williams' first two court-appointed attorneys withdrew due to conflicts of interest, the court appointed James Lackey and James Wilson to represent him. Williams' trial commenced in February 1990

3

in the Circuit Court of Mobile County, Alabama.

During jury selection, Williams' counsel raised a *Batson* objection[1] based on the state's use of peremptory challenges to exclude four African Americans from the jury. At the direction of the court, the state provided explanations for each of these strikes. Upon hearing the proffered reasons, the court denied Williams' motion.

At trial, the state sought to establish that Williams and Hasser did not know each other and that Williams had targeted Hasser for his Porsche. In addition to the evidence described above, the state relied on various inconsistent statements that Williams had given the police following his arrest. The state also introduced physical evidence discovered at Williams' place of residence, including diary entries indicating that the murder and robbery were planned in advance. Additionally, a number of witnesses testified that Williams had told them prior to the murder that he would be getting a Porsche.

The defense's theory was that Hasser was murdered during the course of a drug deal gone awry. Defense counsel attempted to establish that Williams dealt drugs for Hasser, who had promised to give him the Porsche as payment. In support of this theory, the defense offered witness testimony suggesting that

---

[1] *See Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

Williams and Hasser knew one another. In addition, the defense relied on handwritten documents discovered in the Porsche that purported to convey the car from Hasser to Williams. According to the defense, drug dealers shot Hasser after he and Williams drove to Creola for a drug transaction, and the dealers ordered Williams to dispose of the body.

On February 16, 1990, the jury returned a verdict finding Williams guilty of capital murder.

### 2. Penalty Phase

The penalty phase began immediately following the return of the verdict. The state presented no additional evidence. The defense offered one witness: Williams' mother, Arcola Williams. In brief testimony, Ms. Williams stated that her son lived primarily with his grandmother in Mobile until he was four years old, and was later sent to stay with an aunt in Leroy during the school year. At age six, Williams returned to live at his parents' home, where, according to Ms. Williams, his father, Herbert Williams, Sr., beat him "many times." Ms. Williams stated that "children have to be whipped sometimes," but that it "seem[ed] like he whipped him more than he should." When Williams was a teenager, his father "beat him from time to time with his fists." Ms. Williams described one incident in which her husband took Williams into a bedroom and was "pretty rough with him,"

though she noted that she was not in the room. Afterwards, her son called the police from a neighbor's house and said his father "had choked him and did everything to him while he was in there."

Ms. Williams further testified that while Williams was growing up, her husband drank heavily, used marijuana, and beat her in their son's presence. She concluded her testimony by stating that her husband was presently incarcerated for molesting and raping the couple's mentally retarded daughter.

Following deliberations, the jury returned with a recommendation that Williams be sentenced to life in prison without parole. The vote consisted of nine jurors in favor of life without parole, and three in favor of death.

The court set a sentencing hearing for April 11, 1990, and ordered a presentence investigation report (PSI). During the sentencing hearing, neither the state nor the defense presented additional evidence. In their argument to the court, defense counsel relied on the mitigating factors that they had raised previously, as well as the PSI, which stated that Williams' mother "has an excellent reputation in the Thomasville area." The judge responded: "I don't think anyone . . . would question that his mother has an excellent reputation and that his mother and grandmother are extremely good people." At the conclusion of the hearing, the judge requested a proposed order for each of the two possible sentences, noting

6

that he "just need[ed] to think about it more."

On April 26, 1990, the court sentenced Williams to death. Of the eight statutory aggravating circumstances available under Alabama law, the court found the existence of one: that the murder was committed while the defendant was engaged in the commission of a robbery. *See* Ala. Code § 13A-5-49(4). In addition, the court stated that it attached "great significance to the calculated precision with which this crime was planned and systematically executed. The Defendant's diary manifests a greed and depravity of mind characteristic of an individual who has an utter disregard for human life and the rights and property of others."

The court found a total of three mitigating circumstances—two statutory and one non-statutory. The statutory mitigators were Williams' lack of prior criminal activity, *see id.* § 13A-5-51(1), and his youth at the time of the offense, *see id.* § 13A-5-51(7). As to the latter, however, the court stated: "The reptilian coldness with which this criminal act was devised and perpetrated vitiates any contention that the innocence of youth was a factor in the murder of Timothy Hasser." The non-statutory mitigator was the court's finding "that the Defendant's father was violent and abusive towards him as a child." The court concluded, however, that "[t]his fact . . . makes the Defendant no less accountable for his action."

Furthermore, the court stated, Williams' upbringing did not lack positive aspects: "The court . . . considered that the Defendant's mother and grandmother testified in his behalf. Both appeared to be decent people who genuinely cared for the Defendant. It, therefore, would strain credulity to find that the Defendant's background was one of total deprivation."[2]

In addition to these mitigating factors, the court stated that it gave "very serious consideration and substantial weight" to the jury's recommendation of life imprisonment. However, the court determined that "the aggravating circumstance in this case outweighs the mitigating circumstances," and therefore "the punishment should be death notwithstanding the jury's contrary recommendation."

### 3. Direct Appeal

Williams' trial attorneys withdrew from the case after sentencing, and new counsel was appointed to represent him on appeal. On August 27, 1993, the Alabama Supreme Court affirmed Williams' conviction and sentence. *Ex parte Williams*, 627 So. 2d 999 (Ala. 1993). The United States Supreme Court denied certiorari on March 28, 1994. *Williams v. Alabama*, 511 U.S. 1012, 114 S. Ct. 1387, 128 L. Ed. 2d 61 (1994).

### C. Rule 32 Proceedings

---

[2] Williams' grandmother, Evelyn Eaton, testified during the guilt phase.

Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure, Williams filed a petition for post-conviction relief in the Circuit Court of Mobile County. Among Williams' claims was the contention that his trial attorneys rendered constitutionally defective assistance by failing to investigate and present mitigating evidence relating to his background.

### 1.    *Evidentiary Hearing*

In June and July of 1997, an evidentiary hearing on Williams' Rule 32 petition was held before the same judge who had presided at trial. At the hearing, Williams sought to establish his ineffective assistance claim through the testimony of several witnesses who did not testify at trial. Three of these witnesses were family members who said they would have been willing to testify at that time but were never contacted by Williams' attorneys. Williams also presented testimony from a psychiatrist who reported the results of an extensive investigation into Williams' background and psychological history. In addition, Williams relied on testimony from his two trial attorneys, James Wilson and James Lackey.[3]

Williams' half-sister, Queenie May Patterson Peoples, testified in stark detail about the nature and extent of the abuse that occurred in Williams' home

---

[3] During the hearing, Williams offered testimony from a number of additional witnesses, including Arcola Williams. Much of this testimony involved claims that are not before us on appeal.

9

during his upbringing. She testified that the beatings perpetrated by Williams Sr. began when Williams was a small child and involved an extreme level of violence. During Williams' early childhood, Peoples stated, his father would hold him in the air with one arm and repeatedly whip him with a thick belt until he was too exhausted to continue. He would then "switch sides" and resume whipping with his other arm. She stated that this type of abuse continued "until we were old enough that we could . . . move about a lot. Then they make you lay in the bed." As an additional example of Williams Sr.'s cruelty, Peoples described an incident in which he forced Williams, who was then a small boy, to spend an entire day in a hole dug for a septic tank.

Peoples also discussed a number of instances in which Williams witnessed his father viciously attack his mother or siblings. Peoples testified that it was "a regular thing in our household" for Williams Sr. to "use[] my mother as a punching bag" and that Williams Sr. gave his wife "busted lips and black eyes and bruises" that were apparent to Williams. On one occasion, Williams Sr. struck his wife in the mouth so hard that he broke the bridge of her false teeth. Peoples noted that several of these beatings took place while Arcola Williams was pregnant with Williams' younger brother Thomas. During that time, Williams Sr. "would knock her down in [sic] the floor . . . . He would hit her in the stomach. He would kick

10

her and knock her down and it was my opinion that he was trying to make her lose the baby because he did not believe it was his." Later, when Thomas was two, Williams Sr. became enraged after discovering that the child had apparently eaten his stash of marijuana. Williams Sr. began beating Thomas with his belt, and when Thomas would not stop crying, Williams Sr. threw him against a wall. After that incident, Thomas did not speak again for four years.[4]

Peoples testified that Williams Sr.'s abusive acts frequently involved the use of weapons. In one incident that occurred while Williams was present in the home, Williams Sr. threatened to decapitate his wife:

> They got into an argument and he told my mother that he was going to kill her and he made her get down on her knees, hands and knees, and hold her head out, and he had this—this long knife. It was bigger than a butcher knife, but it was shorter than a regular size machete, and he said he was going to cut her head off, and . . . I ran outside and he came outside and got me and brought me back in the house and sent me to my room. So, while I was in my room I let the window up and I jumped out the window and I went next door and called the cops because I really believed that he would do it.

Peoples described another incident in which Williams witnessed his father throw a pair of scissors at her; the scissors missed their target and "went into the wall." On another occasion, Williams Sr. broke a Coca-Cola bottle over Arcola Williams' head. Peoples also described two instances in which Williams Sr. fired

---

[4] Additional Rule 32 testimony indicated that Thomas was subsequently diagnosed as having abnormal brain functioning.

guns during arguments with his wife.

According to Peoples, Arcola Williams did little to protect her children from Williams Sr.'s abuse. Peoples stated that their mother "never did or never said anything" when Williams Sr. was beating Williams. When Peoples told her mother that Williams Sr. was sexually abusing her, Arcola Williams did not come to her defense: "She took him to his word. She never told us that she believed us for anything that we said. She always took his side."[5]

Moreover, Peoples testified, Arcola Williams herself was physically abusive toward her children. Peoples said that their mother would beat them at Williams Sr.'s direction, using belts or other instruments. In doing so, Arcola Williams took steps to ensure that the resulting bruises would not be visible to others: "[S]he would make us pull off all our clothes except for our underwear and we had to lay down across the bed, face down, because they didn't believe in hitting in the front because they would show bruises and people would know. So, we had to lay face down and they would take the belt or whatever and just whip us from the back."

Williams next offered testimony from Curtis Williams, his uncle. Curtis Williams recalled observing bruises on Williams when the latter was a child, and

---

[5] The Rule 32 testimony indicated a history of incest within the family. According to Peoples, she was told that she was the product of her maternal grandfather's rape of his daughter, Arcola Williams.

said that Williams told him he had been beaten by his father. In addition, he testified that Arcola Williams was consistently absent during Williams' childhood because of her extensive involvement with her church. As a result, she failed to attend to the ongoing problems in the home, where "the family structure [broke] down." When she was at home, Ms. Williams was unable to protect her children from her husband's abuse, largely because she feared being attacked herself. In order to escape the situation, Williams visited Curtis Williams in Mobile at every possible opportunity.

Deborah Perine, Williams' aunt, provided brief testimony concerning the period during Williams' early childhood when he lived with his grandmother, Evelyn Eaton. Perine assisted Eaton in raising Williams from the time he was an infant until he was approximately two years old. In testimony suggesting that Arcola Williams was rarely present during that period, Perine stated that Williams believed that she, Perine, was his mother.

Williams' also offered testimony from Dr. Eliot Gelwan, a psychiatrist specializing in psychopathology and differential diagnosis. Dr. Gelwan conducted a thorough investigation into Williams' background, relying on a wide range of data sources. He conducted extensive interviews with Williams and with fourteen other individuals who knew Williams at various points in his life. In addition, he

reviewed a variety of documents, including Williams' educational, employment, and medical records; police reports complied after his arrest; and the psychological evaluation reports prepared prior to trial.

Based on these sources of information, Dr. Gelwan concluded that Williams experienced "an extreme brutalizing exposure to trauma" that began upon his return from his grandmother's home at age four and continued until he left his parents' home at age seventeen or eighteen. During those years, Williams suffered or witnessed beatings on a regular basis, generally several times a week. Echoing Peoples' testimony, Dr. Gelwan described a number of instances of particularly severe abuse. For example, shortly after Williams returned home from Job Corps at age seventeen, his father broke a chair over his head. Dr. Gelwan also reported that Williams had memories of his father beating his mother while she was pregnant with Williams' younger siblings. In one such incident, which occurred when Williams was four or five, Williams Sr. repeatedly struck his wife in the stomach until she vomited.[6]

Dr. Gelwan also testified that Williams' childhood was characterized by extreme neglect and deprivation. He noted that Williams' mother would leave him unsupervised from the time he was four or five, and that Williams would roam the

---

[6] Dr. Gelwan noted that medical records for Williams' younger sister Mabel indicated signs of fetal distress. As noted, Mabel Williams was diagnosed as being mentally retarded.

neighborhood alone. The situation was exacerbated by Ms. Williams' involvement with her church. In addition to spending significant amounts of time there, Ms. Williams made large financial donations to the church. As a result, Williams and his siblings frequently ate handouts or leftovers from her job. Dr. Gelwan also noted that Williams was provided very little in the way of adequate clothing, even by the standards of the poor community in which he lived.

Providing further evidence of neglect, Dr. Gelwan testified as to the lack of attention given to Williams' hygiene and medical needs. He noted that no one supervised Williams' cleanliness as a child. Indeed, Williams was unaware that people brushed their teeth on a daily basis until he was incarcerated at age nineteen. Nor did Williams receive proper medical attention for his injuries. Dr. Gelwan described an instance in which Williams suffered a severe laceration on his arm that went to the bone. This injury was treated at home, and the bandage was left unchanged and unexamined for several weeks.

In addition, Dr. Gelwan testified that Williams suffered emotional neglect. He found that there was an almost total lack of parental functioning in the Williams household, to the point that Williams could be characterized as "someone who never had effective parents." In contrast to the trial court's assessment, Dr. Gelwan described Arcola Williams as a neglectful and abandoning mother. Her

15

unavailability, Dr. Gelwan believed, contributed to a "catastrophic collapse" in Williams' academic performance that led to his having to repeat the fourth grade. Williams' isolation was intensified when the family relocated to a remote part of Thomasville where there were no neighbors—a move that occurred after the family's previous landlord asked them to leave because of frequent police visits in response to domestic violence complaints. In that isolated location, Williams had few peer relationships and few activities outside the home. Dr. Gelwan characterized the situation as one of "on-going captivity," from which Williams' only escape was to "go off deep into the woods and be alone." For a time, Williams played football, but his father ended his involvement in that activity.

Additionally, Dr. Gelwan discussed Williams' history of clinical depression. Williams' Job Corps records indicated that he was hospitalized with serious depression, which ultimately forced him to withdraw from the program. He was prescribed an antidepressant medication and was sent home with the recommendation that he receive follow-up treatment.

In addition to these witnesses, the Rule 32 court heard testimony from Wilson and Lackey, who represented Williams at trial. Wilson recalled that Lackey was responsible for gathering information for the sentencing phase because he, Wilson, had never handled a capital trial. Lackey testified that he did not recall

16

trial counsel doing anything in preparation for sentencing "that we hadn't already done." He did not recall interviewing any of Williams' family members, with the possible exception of "his mother or an aunt or something." Lackey also could not recall talking to a defense psychologist, Dr. C. Van Rosen, prior to the latter's evaluation of Williams. Nor did he recall any effort by trial counsel to investigate a statement in Dr. Rosen's report concerning the possibility of a drug abuse diagnosis. Overall, Lackey said, he "was not doing much of anything other than legal research" and non-witness-related trial preparation.

Upon questioning by the state, Lackey testified that he and Wilson declined to use Dr. Rosen's report because, in his recollection, it indicated "that there was nothing basically wrong with Mr. Williams." As a result, Lackey said, it was determined that Dr. Rosen's testimony would not be very helpful at either the guilt phase or the sentencing phase.

### 2. *Disposition of Petition*

On January 27, 1999, the court entered an order denying relief on Williams' Rule 32 petition. With respect to the ineffective assistance claim, the court rejected the argument that trial counsel's failure to present additional evidence of abuse and neglect constituted deficient performance. The court held that Williams' attorneys were not required to present additional evidence beyond that which they offered at

17

sentencing.

Additionally, the court found that trial counsel's failure to present mental health evidence did not constitute deficient performance. The court noted that Williams was evaluated by Dr. Rosen before trial, but his attorneys declined to use the psychologist's testimony because they determined it would not be helpful. The court also rejected Williams' argument on the ground that he failed to establish that Dr. Gelwan would have been available to testify at his trial in 1990. In addition, the court determined that Dr. Gelwan's mental health findings lacked credibility.

Finally, the court held that Williams was not prejudiced by trial counsel's failure to offer additional evidence. The court found that the evidence concerning Williams' background had little mitigation value because it "was never found to have a causal relationship" with the commission of the crime. The court thus found no reasonable probability that the presentation of the additional evidence would have resulted in a sentence other than death.

The Alabama Court of Criminal Appeals affirmed in an order adopting the trial court's analysis of the ineffective assistance claim. *Williams v. State*, 782 So. 2d 811, 821-29 (Ala. Crim. App. 2000). The Alabama Supreme Court denied certiorari on November 9, 2000. *Ex parte Williams*, 782 So. 2d 842 (Ala. 2000).

D.  *Federal Habeas Proceedings*

On November 8, 2001, Williams filed a 28 U.S.C. § 2254 petition for writ of habeas corpus in the Southern District of Alabama. He amended his petition on July 31, 2002. In addition to the ineffective assistance claim, Williams raised several additional grounds for relief, including the contention that the prosecutor violated *Batson* by utilizing peremptory challenges in a racially discriminatory manner. Williams also sought an evidentiary hearing on the ground that the trial judge's conduct during the Rule 32 proceedings deprived him of a full and fair hearing.

In March 2006, the district court dismissed several of Williams' claims as procedurally defaulted, and denied his request for an evidentiary hearing. On October 30, 2006, the court entered an order denying relief on Williams' remaining claims. Subsequently, the court granted a certificate of appealability as to three issues: (1) whether the Alabama court's denial of Williams' ineffective assistance claim based on the failure to investigate and present mitigating evidence was an unreasonable application of clearly established federal law; (2) whether consideration of Williams' *Batson* claim was barred by the doctrines of exhaustion and procedural default; and (3) whether an evidentiary hearing was required.

## II. DISCUSSION

### A. *Ineffective Assistance of Counsel Claim*

Williams argues that he was unconstitutionally denied the effective assistance of counsel as a result of his trial counsel's failure to investigate and present reasonably available mitigating evidence concerning his background. This evidence, he argues, would have demonstrated (1) that Williams suffered severe neglect and deprivation; (2) that Arcola Williams abused Williams and facilitated abuse by her husband; (3) that Williams' father employed weapons and other forms of physical brutality against his family throughout the time Williams lived at home; and (4) that, as a result of these experiences, Williams had a history of psychological problems.

"When examining a district court's denial of a § 2254 habeas petition, we review questions of law and mixed questions of law and fact *de novo,* and findings of fact for clear error." *Grossman v. McDonough*, 466 F.3d 1325, 1335 (11th Cir. 2006) (citation omitted). "An ineffective assistance of counsel claim is a mixed question of law and fact subject to *de novo* review." *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005).

Because Williams' habeas petition was filed after April 24, 1996, his claims are governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Id.* Under AEDPA's "highly deferential" standard of review, *Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 768 (11th Cir. 2003), a federal court may

20

not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The statutory phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).

Williams argues that he is entitled to relief under the "unreasonable application" clause of § 2254(d). A federal habeas court may grant relief under that provision "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S. Ct. at 1523. "The focus of [this] inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable." *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002). "[A]n unreasonable application is different from an incorrect one," and "a federal habeas court may not issue the writ 'simply

21

because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Id.* (quoting *Williams*, 529 U.S. at 411, 120 S. Ct. at 1522). However, AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced.' The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." *Panetti v. Quarterman*, — U.S. —, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007) (citation omitted) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76, 123 S. Ct. 1166, 1175, 155 L. Ed. 2d 144 (2003)).

The Supreme Court established the legal principles governing ineffective assistance claims in *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535, 156 L. Ed. 2d 471 (2003). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Id.* (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052).

Bearing these principles in mind, we consider whether the Alabama courts' rejection of Williams' ineffective assistance claim constituted an unreasonable

application of *Strickland*. We address the performance and prejudice factors in turn.

### 1. *Deficient Performance*

To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins*, 539 U.S. at 521, 123 S. Ct. at 2535 (second alteration in original) (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2052). In applying this standard, we "'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc) (alteration in original) (quoting *Strickland,* 466 U.S. at 689-90, 104 S. Ct. at 2065-66). Accordingly, a petitioner seeking to establish deficient performance bears a heavy—albeit not insurmountable—burden of persuasion. *Id.*

In this case, the claim of deficient performance is based on trial counsel's failure to investigate and present mitigating evidence concerning Williams'

23

background. We have recognized that "[a]n attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." *Porter v. Singletary*, 14 F.3d 554, 557 (11th Cir. 1994) (citation omitted). This duty does not necessarily require counsel to investigate every evidentiary lead. *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989). However, the decision to limit an investigation "must flow from an informed judgment." *Id.* Under *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91, 104 S. Ct. at 2066. Therefore, "[i]n assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527, 123 S. Ct. at 2538.

In arguing that his trial counsel's investigation of mitigating evidence in his background fell short of prevailing professional norms, Williams relies principally upon the Supreme Court's decision in *Wiggins*.[7] The petitioner in that case was

---

[7] The district court held that AEDPA precludes reliance on *Wiggins*. Because that case was decided after the denial of Williams' Rule 32 petition became final, the district court concluded that it is not "clearly established Federal law" under § 2254(d)(1). We disagree.

This question was analyzed thoroughly in our recent decision in *Newland v. Hall*, though

24

convicted of capital murder. His attorneys' investigation into mitigating evidence drew from three sources: reports prepared for the defense by a psychologist; a PSI containing vague indications of Wiggins' troubled background; and Department of Social Service (DSS) records documenting Wiggins' various foster care placements. *Id.* at 523, 123 S. Ct. at 2536. Despite having this information, Wiggins' counsel introduced no evidence concerning his life history during the sentencing hearing. *Id.* at 515, 123 S. Ct. at 2532. The jury sentenced Wiggins to death. During state postconviction proceedings, Wiggins presented testimony from a social worker who had prepared an elaborate social history report on Wiggins'

---

the relevant portion of the opinion expressed the views of only one judge. 527 F.3d 1162, 1195-1201 (11th Cir. 2008) (opinion of Tjoflat, J.). In *Newland*, Judge Tjoflat concluded that *Wiggins*, as well as the Supreme Court's decisions in *Williams* and *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), are not "new law" for purposes of the retroactivity principles of *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). *See Newland*, 527 F.3d at 1197. Based on that conclusion, Judge Tjoflat determined that although the relevant state court decision in *Newland* was issued before *Wiggins* and *Rompilla*, the latter two decisions still constituted "clearly established Federal law" under AEDPA. *Id.* at 1200; *see Williams*, 529 U.S. at 412, 120 S. Ct. at 1495 ("[W]hatever would qualify as an old rule under our *Teague* jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1).").

Judge Tjoflat's conclusions are consistent with the Supreme Court's own characterization of its decisions. *See Wiggins*, 539 U.S. at 522, 123 S. Ct. at 2535-36 (explaining that the Court "made no new law" in resolving ineffective assistance claim in *Williams*, but instead "applied the same 'clearly established' precedent of *Strickland we apply today*" (emphasis added)). Moreover, we have relied upon *Wiggins* in reviewing a state court decision denying postconviction relief, notwithstanding that *Wiggins* was handed down after the state court decision at issue. *See Callahan v. Campbell*, 427 F.3d 897, 935 (11th Cir. 2005). We thus have recognized implicitly that *Wiggins* did not create new law, but rather applied the underlying principles of *Strickland* to a different factual scenario.

Accordingly, we conclude that AEDPA presents no bar to Williams' reliance on *Wiggins*. As an "old rule" under *Teague*, that decision constitutes clearly established federal law within the meaning of § 2254(d)(1). *See Newland*, 527 F.3d at 1201.

background. The report contained evidence that Wiggins suffered severe physical and sexual abuse at the hands of his mother and while in the care of a series of foster parents. *Id.* at 516-17, 123 S. Ct. at 2532-33.

The Supreme Court held that the decision of Wiggins' trial counsel not to expand the scope of their investigation into his background fell short of prevailing professional standards. The Court concluded that Wiggins' counsel "abandoned their investigation into petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524, 123 S. Ct. at 2537. The Court also found the scope of the investigation to be unreasonable "in light of what counsel actually discovered in [Wiggins'] DSS records." *Id.* at 525, 123 S. Ct. at 2537. These documents revealed evidence concerning, among other things, Wiggins' mother's alcoholism, his history of emotional difficulties, and the fact that he had experienced severe deprivation. *See id.*

The Court further held that the state appellate court's application of *Strickland*'s governing legal principles was objectively unreasonable. *Id.* at 527, 123 S. Ct. at 2538. Rather than assessing whether it was reasonable for trial counsel to cease all investigation after obtaining the PSI and DSS records, the state court merely assumed that the investigation was adequate. *Id.* The state court also

26

unreasonably applied *Strickland* by deferring to counsel's "strategic decision" regarding mitigation evidence, "despite the fact that counsel based this alleged choice on what we have made clear was an unreasonable investigation." *Id.* at 528, 123 S. Ct. at 2538.

In this case, trial counsel's investigation into mitigating evidence was similar in scope to the investigation at issue in *Wiggins*. As in *Wiggins*, trial counsel's sentencing phase preparation drew upon three sources of information. First, counsel had access to the report prepared by Dr. Rosen, the defense psychologist. Dr. Rosen conducted a psychological examination of Williams for the purpose of determining his competency to stand trial and his mental state at the time of the offense. Dr. Rosen's report stated, among other things, that Williams had an IQ of 83, exhibited signs of a personality disorder and depression, and was a possible suicide risk. The report did not, however, provide any information as to Williams' social history. Moreover, the report stated that the only information obtained on that topic came from interviews with Williams himself. Second, counsel had access to the PSI, which briefly noted Williams' description of his father as "a long-term alcoholic" who "frequently abused [Williams'] mother and children in the family." The PSI also noted that Williams had talked to a psychologist three times while in Job Corps, and had also seen a psychologist in Alabama. Finally,

27

trial counsel interviewed Williams' mother, Arcola Williams.

We conclude that trial counsel's failure to broaden the scope of their investigation beyond these sources was unreasonable under prevailing professional norms. In assessing the reasonableness of an attorney's performance, the Supreme Court has looked to standards promulgated by the American Bar Association (ABA) as appropriate guides. *See Wiggins*, 539 U.S. at 524, 123 S. Ct. at 2536-37. The ABA standards pertaining to capital defense work in 1990 provided that a sentencing phase investigation "should comprise efforts to discover all reasonably available mitigating evidence." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989). As part of these efforts, counsel had a duty to collect information pertaining to "family and social history (including physical, sexual or emotional abuse)," and to "obtain names of collateral persons or sources to verify, corroborate, explain and expand upon [the] information obtained." *Id.*, 11.4.1(D). The Guidelines do not establish a specific number of persons who should be interviewed, and indeed we have rejected the idea that there is a "magic number" of witnesses from whom an attorney is required to seek mitigating evidence. *Alderman v. Terry*, 468 F.3d 775, 792 (11th Cir. 2006). However, we have found deficient performance in cases where an attorney's efforts to speak with available witnesses were insufficient "to formulate

28

an accurate life profile of [the] defendant." *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995). *See, e.g.*, *Dobbs v. Turpin*, 142 F.3d 1383, 1388 (11th Cir. 1998) (finding deficient performance where counsel failed to interview potential witnesses who could have testified regarding defendant's unfortunate childhood); *Jackson*, 42 F.3d at 1364 (finding deficient performance where counsel failed to interview anyone in defendant's family and thus failed to discover mitigating evidence in defendant's background); *Armstrong v. Dugger*, 833 F.2d 1430, 1432-33 (11th Cir. 1987) (finding deficient performance where counsel's investigation of mitigating evidence consisted of single conversation with defendant and his parents, and another conversation with defendant's parole officer). Here, despite the availability of several of Williams' family members, trial counsel sought mitigating evidence from only one person with firsthand knowledge of his background: his mother. By choosing to rely entirely on her account, trial counsel obtained an incomplete and misleading understanding of Williams' life history.

Furthermore, the information that trial counsel did acquire would have led a reasonable attorney to investigate further. *See Wiggins*, 539 U.S. at 527, 123 S. Ct. at 2538. Trial counsel knew from speaking with Arcola Williams that the defendant had experienced abuse as a child. In addition, they had possession of the PSI, which indicated (albeit in a cursory fashion) that Williams, his siblings, and

his mother were abused by Williams Sr. The PSI further noted Williams' history of psychological problems and his repeated efforts to obtain treatment. Finally, counsel had available Dr. Rosen's report, which indicated that Williams showed "considerable depression, a very poor self-esteem, the possibility of a suicide risk and [a] tendency toward distorting reality." As was true in *Wiggins*, "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background." 539 U.S. at 525, 123 S. Ct. at 2537.

A reasonable investigation into the leads in this case should have included, at a minimum, interviewing other family members who could corroborate the evidence of abuse and speak to the resulting impact on Williams. Counsel, however, failed to contact such witnesses. We have recognized in similar circumstances that such failure is indicative of deficient performance. *See, e.g.*, *Jackson*, 42 F.3d at 1367 (finding deficient performance where counsel "had a small amount of information regarding possible mitigating evidence regarding [defendant's] history, but . . . inexplicably failed to follow up with further interviews and investigation"); *Elledge v. Dugger*, 823 F.2d 1439, 1445 (11th Cir. 1987) (per curiam) (finding deficient performance where defendant made counsel

aware of abusive background, but counsel "did not even interrogate [defendant's] family members to ascertain the veracity of the account or their willingness to testify"), *withdrawn in part on denial of reh'g*, 833 F.2d 250 (en banc).

Trial counsel's failure to pursue this additional evidence cannot be characterized as the product of a reasonable strategic decision. Counsel uncovered nothing in their limited inquiry into Williams' background to suggest that "further investigation would have been fruitless." *Wiggins*, 539 U.S. at 525, 123 S. Ct. at 2537. To the contrary, the many red flags noted above would have a prompted a reasonable attorney to conduct additional investigation. Moreover, acquiring additional mitigating evidence would have been consistent with the penalty phase strategy that counsel ultimately adopted. Given that counsel's sentencing case focused on establishing that Williams had a troubled background, they had every incentive to develop the strongest mitigation case possible. *Cf. id.* at 526, 123 S. Ct. at 2538. It thus is apparent that counsel's failure to expand their investigation "resulted from inattention, not reasoned strategic judgment." *Id.* at 526, 123 S. Ct. at 2537.[8]

---

[8] The state notes that trial counsel made a strategic decision not to utilize psychological testimony from Dr. Rosen at the penalty phase because they determined that such testimony would be unfavorable to Williams. The state argues that, in light of this strategic decision, trial counsel were not required to "shop" for another expert to provide opinions similar to those offered by Dr. Gelwan at postconviction. However, this argument is inapposite, as Williams is not relying on the medical conclusions provided by Dr. Gelwan. The only evidence from Dr. Gelwan's testimony that Williams has cited are the factual assertions drawn from his

31

In finding trial counsel's performance adequate, the Alabama Court of

Criminal Appeals focused entirely on counsel's decision not to present additional

mitigating evidence at sentencing.[9] The court did not, however, address whether

counsel's *investigation* into such evidence was adequate under prevailing

professional norms. The court appears to have assumed, based on the fact that

Williams' sentencing phase presentation included some evidence of abuse, that

counsel's investigation was sufficient to permit a reasonable decision as to what

evidence should be offered. *See Williams v. State*, 782 So. 2d at 826. However,

"[i]n assessing the reasonableness of an attorney's investigation, . . . a court must

consider not only the quantum of evidence already known to counsel, but also

whether the known evidence would lead a reasonable attorney to investigate

further." *Wiggins*, 539 U.S. at 527, 123 S. Ct. at 2538. As discussed above, we

conclude that trial counsel abandoned their investigation at an unreasonable point,

particularly in light of the information about Williams' background that the

investigation revealed. By simply assuming that trial counsel's investigation was

adequate, without considering the reasonableness of counsel's decision to limit the

---

investigation into Williams's background. Had counsel consulted the sources relied upon by Dr. Gelwan in conducting this investigation, they would have discovered the information described in his testimony.

[9] As noted, the Alabama Court of Criminal Appeals adopted the relevant portion of the Circuit Court's opinion with respect to this claim.

scope of their inquiry, the Alabama court unreasonably applied *Strickland*. *See id.* at 527-28, 123 S. Ct. at 2538.

In its order denying relief under § 2254, the district court did not rely on the Alabama courts' assessment of trial counsel's performance. Instead, it found the record insufficiently clear as to the specific actions taken by counsel in preparation for the penalty phase. The court thus concluded that Williams failed to carry his burden to establish deficient performance. *See Chandler*, 218 F.3d at 1315 n.15 (holding that ambiguous or silent record is insufficient to overcome presumption that attorney's conduct was reasonable).

We believe the district court's conclusion mischaracterizes the evidence adduced during the Rule 32 hearing. In that proceeding, Lackey, Wilson, and three of Williams' family members each provided specific information concerning the scope of trial counsel's investigation into mitigating evidence. As noted, Lackey testified that he did not recall speaking to any of Williams' family members—with the possible exception of one relative—as part of his sentencing phase preparation. He further testified that he never spoke to Williams about the latter's background. Lackey also stated that his preparation for trial involved little more than legal research. For his part, Wilson stated that Lackey was responsible for gathering information for the sentencing phase because only Lackey had previously handled

a capital trial. Moreover, Queenie May Patterson Peoples, Curtis Williams, and Deborah Perine all testified that they were never contacted by Williams' attorneys prior to trial. In light of this unrebutted testimony, the district court erred in concluding that the record was unclear with respect to trial counsel's investigation. Williams' Rule 32 evidence was sufficient to overcome the presumption that trial counsel's investigation was reasonable.

In light of the foregoing, we conclude that trial counsel's investigation of mitigating evidence in Williams' background fell short of prevailing professional norms, and that the Alabama Court of Criminal Appeals unreasonably applied *Strickland* in ruling to the contrary. We now turn to *Strickland*'s prejudice prong.

### 2. Prejudice

To establish prejudice under *Strickland*, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result in the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In a case challenging a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S. Ct. at 2069. This standard

34

presumes a reasonable sentencer. *Id.* at 695, 104 S. Ct. at 2068 ("[T]he idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency[,] . . . . are irrelevant to the prejudice inquiry."). In assessing prejudice, the reviewing court must consider the totality of the evidence, mindful that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 S. Ct. at 2069.

The mitigation evidence that Williams' trial counsel failed to discover paints a vastly different picture of his background than that created by Arcola Williams' abbreviated testimony. As reported by Williams' family members and Dr. Gelwan, the violence experienced by Williams as a child far exceeded—in both frequency and severity—the punishments described at sentencing. These witnesses characterized the Williams household as one in which severe beatings and other forms of violence occurred on a near constant basis. Moreover, contrary to the impression created by Arcola Williams, this violence was not of a type remotely associated with ordinary parental discipline. Williams Sr.'s beatings were in fact serious assaults, many of which involved the use of deadly weapons. In a number of instances, these attacks resulted in serious injuries, most notably in the case of Williams' brother, Thomas. This evidence surely would have been relevant to an

35

assessment of Williams' culpability, particularly in light of his age and lack of

prior criminal history. *See Wiggins*, 539 U.S. at 535, 123 S. Ct. at 2542 (noting

that petitioner "has the kind of troubled history we have declared relevant to

assessing a defendant's moral culpability").

Other evidence introduced in the Rule 32 proceedings contradicted factors

expressly relied upon by the trial judge as grounds for imposing the death penalty.

In discounting the significance of the abuse described at sentencing, the judge

emphasized that the defendant was cared for by his mother and grandmother.

Therefore, the judge believed, "[i]t . . . would strain credulity to find that the

Defendant's background was one of total deprivation." But the Rule 32 evidence

indicated that Williams' childhood was in fact characterized by an extreme level of

deprivation, both physical and emotional. According to the testimony, Williams'

parents provided him with inadequate food and clothing, neglected his basic

hygiene and medical needs, permitted him to roam the neighborhood unsupervised,

and ignored his deteriorating academic performance. Moreover, in contrast to the

judge's observation, Arcola Williams was described as a neglectful parent who was

frequently absent during her son's childhood. The testimony also indicated that

Ms. Williams herself contributed to the physical abuse suffered by Williams.

Given the importance the trial judge placed on Williams' relationship with his

mother and his purported lack of deprivation, this evidence clearly would have been beneficial to Williams had it been presented.

Further supporting a finding of prejudice is the fact that this case is not highly aggravated. It is well established that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069; *see also Wiggins*, 539 U.S. at 538, 123 S. Ct. at 2544 (finding prejudice where state's evidence in support of death penalty was "far weaker" than in prior case). Here, the trial court imposed the death penalty on the basis of a single statutory aggravating circumstance—one that is an element of the underlying capital murder charge. *See* Ala. Code § 13A-5-40(a)(2). The relative weakness of the state's death penalty case is underscored by the fact that the jury recommended a life sentence by a vote of 9-3. We have recognized that "[p]rejudice is more easily shown in jury override cases because of the deference shown to the jury recommendation." *Harich v. Wainwright*, 813 F.2d 1082, 1093 n.8 (11th Cir. 1987), *adopted by en banc court*, 844 F.2d 1464, 1468-69 (11th Cir. 1988) (en banc), *overruling on other grounds recognized in Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997). The fact that the jury decisively voted against the death penalty, even without the powerful evidence adduced at postconviction,

weighs heavily in favor of a finding of prejudice.

The Alabama Court of Criminal Appeals nevertheless discounted the postconviction evidence, finding no reasonable probability that it would have led the trial court to impose a sentence other than death. The court based this conclusion primarily on the fact that the additional mitigating evidence did not refute the evidence establishing Williams' responsibility for the capital murder. *See Williams v. State*, 782 So. 2d at 826 ("[T]he evidence regarding Williams' background was never found to have a causal relationship with Williams committing capital murder."). In light of that consideration, the court concluded that Williams' Rule 32 evidence had "little mitigation value." *Id.* at 827.

We conclude that the Alabama court's emphasis on the absence of a "causal relationship" between Williams' mitigating evidence and the statutory aggravator reflects an unreasonable application of *Strickland*. In so holding, we are guided by the Supreme Court's reasoning in *Williams v. Taylor*.[10] In that case, the petitioner, a death row inmate, argued in state habeas proceedings that his trial counsel rendered ineffective assistance by failing to investigate and present mitigating

---

[10] For the reasons discussed above with respect to *Wiggins*, *see supra* note 7, *Williams* constitutes clearly established federal law within the meaning of § 2254(d)(1), even though it was issued after the relevant state court decision in this case. Indeed, we have previously cited *Williams* in reviewing state court decisions that were issued before it was handed down. *See Callahan v. Campbell*, 427 F.3d 897, 926, 934-35 (11th Cir. 2005); *Crawford v. Head*, 311 F.3d 1288, 1314-16 (11th Cir. 2002).

evidence concerning his childhood, intellectual capacity, and conduct in prison. The Virginia Supreme Court concluded that the petitioner failed to establish sufficient prejudice, finding that the additional evidence "barely would have altered the profile of [the] defendant" presented at sentencing. *Williams v. Warden*, 487 S.E.2d 194, 200 (Va. 1997). The U.S. Supreme Court held that this "prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation." *Williams v. Taylor*, 529 U.S. at 397-98, 120 S. Ct. at 1515.

Central to the Court's holding in *Williams* was its conclusion that the Virginia Supreme Court failed to give sufficient weight to mitigating evidence that did not relate to the aggravating circumstance in the case—the petitioner's future dangerousness. While noting that the postconviction evidence might not have refuted the evidence supporting this aggravator, the Court emphasized that it still could have affected the sentence imposed. *See id.* at 398, 120 S. Ct. at 1515 ("[T]he graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."). The Court made clear that "[m]itigating evidence unrelated to dangerousness may alter the jury's

selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Id.* at 398, 120 S. Ct. at 1516. Because the state court did not entertain that possibility, it "failed to accord appropriate weight to the body of mitigation evidence available to trial counsel." *Id.*

The Alabama Court of Criminal Appeals' opinion implicates the same concern that the Court addressed in *Williams*. Like the state court in that case, the Alabama court rested its prejudice determination on the fact that Williams' mitigating evidence did not undermine or rebut the evidence supporting the aggravating circumstance. It did not consider the possibility that the mitigating evidence, taken as a whole, might have altered the trial judge's appraisal of Williams' moral culpability, notwithstanding that the evidence did not relate to his eligibility for the death penalty. In particular, the court did not address Williams' argument that the evidence contradicted factors relied upon by the trial judge in assessing Williams' culpability. Thus, as in *Williams*, the court "failed to evaluate the totality of the available mitigation evidence" in reweighing the aggravating and mitigating circumstances in this case. *Id.* at 397-98, 120 S. Ct. at 1515. This failure constitutes an unreasonable application of *Strickland*.

In its own assessment of prejudice, the district court focused on the fact that the same judge who sentenced Williams to death presided at the Rule 32 hearing.

Because that judge found no reasonable likelihood that the additional evidence would have prompted him to impose a different sentence, the district court concluded that Williams could not establish prejudice. However, a trial judge's post-hoc statements concerning how additional evidence might have affected its ruling are not determinative for purposes of assessing prejudice. Indeed, in *Strickland*, the trial judge who sentenced the petitioner to death testified during federal habeas proceedings that the additional evidence would not have caused him to rule differently. *See id.* at 678-79, 104 S. Ct. at 2060; *Washington v. Strickland*, 693 F.2d 1243, 1249 (11th Cir. 1982). The Supreme Court held that this testimony was "irrelevant to the prejudice inquiry." *Strickland*, 466 U.S. at 700, 104 S. Ct. at 2071. The Court made clear that the assessment should be based on an objective standard that presumes a reasonable decisionmaker. *Id.* at 695, 104 S. Ct. at 2068. Applying that standard, we conclude that Williams has demonstrated sufficient prejudice to warrant relief. For the reasons discussed above, we cannot say with confidence that the outcome of the sentencing phase would have been the same absent his trial counsel's errors.

Having determined that Williams has established both components of an ineffective assistance of counsel claim, and that the Alabama Court of Criminal Appeals' decision involved an unreasonable application of *Strickland*, we conclude

41

that Williams is entitled to habeas relief as to his sentence. Accordingly, we reverse the district court's denial of relief as to Williams' ineffective assistance claim.

*B.*     Batson v. Kentucky *Claim*

In his amended § 2254 petition, Williams argued that the prosecutor utilized peremptory challenges in a racially discriminatory manner, thereby violating the equal protection principles set forth in *Batson*. On appeal, Williams challenges the district court's determination that this claim is procedurally barred because it was not exhausted in state court. We review the district court's ruling on this issue *de novo*. *Atwater v. Crosby*, 451 F.3d 799, 809 (11th Cir. 2006).

A habeas petitioner generally may not raise a claim in federal court that was not first exhausted in state court. 28 U.S.C. § 2254(b)(1); *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1343 (11th Cir. 2004). "To properly exhaust a claim, the petitioner must afford the State a full and fair opportunity to address and resolve the claim on the merits." *Kelley*, 377 F.3d at 1344 (internal quotation marks omitted). "While we do not require a verbatim restatement of the claims brought in state court, we do require that a petitioner presented his claims to the state court such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation." *McNair*, 416 F.3d at 1302 (internal quotation

marks omitted).

In *Batson*, the Supreme Court established a three-part test to evaluate claims of racial discrimination based on the prosecution's use of peremptory challenges. First, the defendant must make a *prima facie* showing that the challenges at issue were made on the basis of race. *Batson*, 476 U.S. at 96, 106 S. Ct. at 1723. Once the defendant makes this showing, the burden shifts to the state to rebut the inference of discrimination by offering race-neutral explanations for the challenges. *Id.* at 97, 106 S. Ct. at 1723. If the prosecutor articulates such reasons, the court must then determine whether the defendant has established purposeful discrimination. *Id.* at 98, 106 S. Ct. at 1724.

Williams' amended habeas petition alleges facts encompassing steps two and three of the *Batson* inquiry. (*See* Am. Pet. at 39 ("All of the reasons that the prosecutor offered in defense of its peremptory strikes against qualified black veniremembers are either contrary to or unsupported by the record, or are not facially neutral.")). The district court, however, determined that the *Batson* claim raised by Williams on direct appeal related only to the second step—i.e., whether the prosecution's explanations for the peremptory strikes were race-neutral. The court thus concluded that Williams' step three *Batson* claim was unexhausted. Because claims not raised on direct appeal are barred under Alabama procedural

43

default rules, the court concluded that exhaustion would be futile.

Williams argues that he presented the substance of his *Batson* step three claim to the Alabama Supreme Court on direct appeal. We agree. A review of Williams' brief to that court demonstrates that his *Batson* argument was broader than the district court's opinion suggests. Williams devoted several pages of the brief to arguing that the state's proffered reasons for the peremptory challenges were unpersuasive under the circumstances. For example, Williams argued that the prosecution failed to conduct meaningful *voir dire* on the purported reasons for the peremptory strikes. In addition, he argued that the justification for striking an African-American potential juror applied equally to white venire members who were not excluded. These are *Batson* step three arguments in that they go to the question of whether the prosecutor's "race-neutral explanation should be believed." *Hernandez v. New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 1869, 114 L. Ed. 2d 395 (1991) (plurality opinion). Given these contentions, a reasonable reader would have understood that Williams' claim implicated the third *Batson* step. *See McNair*, 416 F.3d at 1302.

We thus conclude that Williams has satisfied the exhaustion requirement as to his *Batson* step three claim. Accordingly, we reverse the district court's ruling that the claim is procedurally barred from federal habeas review.

*C. Denial of Evidentiary Hearing*

Finally, Williams argues that the district court improperly denied his request for an evidentiary hearing. Williams contends that the "injudicious conduct" exhibited by the trial judge during the Rule 32 proceedings prevented him from developing evidence related to his ineffective assistance and *Brady*[11] claims.

"We review a district court's decision to grant or deny an evidentiary hearing for abuse of discretion." *Kelley*, 377 F.3d at 1333. A court abuses its discretion if it misapplies the law or makes clearly erroneous findings of fact. *Id.* Here, the district court determined that an evidentiary hearing was not precluded under § 2254(e)(2) because Williams was diligent in seeking to develop the factual bases of his claims in state court.[12] *See Williams v. Taylor*, 529 U.S. at 432, 120 S. Ct. at 1488. The Court then addressed whether a hearing was mandatory under

---

[11] *See Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[12] Section 2254(e)(2) provides:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
    (A) the claim relies on –
        (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Townsend v. Sain*, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963), *overruled*

*in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S. Ct. 1715, 118 L. Ed. 2d 318

(1992), *superseded by statute as stated in Williams*, 529 U.S. at 433, 120 S. Ct. at

1489. In *Townsend*, the Court held that a federal habeas court must hold an

evidentiary hearing under the following circumstances:

> If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Id.* at 313, 83 S. Ct. at 757.

The court determined that the grounds relied upon by Williams arguably

implicated the third or the sixth of these factors. Applying these to Williams'

claims, the court concluded that a hearing was not mandatory. While noting that

the trial judge "interrupted testimony, questioned witnesses, interjected his own

opinion, commented on evidence and arguably made some insensitive comments,"

the court found no indication that this conduct prevented Williams from

developing evidence necessary to adjudicate his claims. The court also declined to

exercise its discretionary authority to hold a hearing, finding the record to be fully

developed with respect to the claims presented.

Upon careful review of the state court record, we find no error in the district court's ruling as to this issue. To be sure, the trial judge made a number of comments during the Rule 32 hearing that suggested a dismissive view of Williams' evidence. However, as the district court noted, Williams has not shown that he was in any way prevented from presenting testimony or introducing evidence in support of his claims. Thus, although many of the trial judge's comments certainly could be described as injudicious, we cannot say that Williams was denied a full and fair hearing within the meaning of *Townsend*.[13] Moreover,

---

[13] We nevertheless are troubled by many of the trial judge's comments. In a number of instances, the judge appeared to take on the role of an advocate against Williams' ineffective assistance claims. At one point, for example, the judge defended the process according to which he appoints counsel in capital murder cases. Noting that he always asks whether the attorney has a problem accepting the appointment, the judge said to Lackey: "And I'm sure I did that in this case, didn't I, Jim?" A similar comment occurred after Lackey testified that he could not recall counsel doing "anything in particular" to prepare for the sentencing phase beyond what had been done previously. The judge interjected: "Well, I do. I remember specifically you all calling his aunt." In a similar vein, the judge repeatedly vouched for trial counsel's qualifications. He expressed the view that Lackey was "extremely qualified," and described Wilson as a "very good" attorney. The judge also referred to Wilson as "my good friend."

Other statements suggest an unwillingness to give Williams' mitigating evidence serious consideration. For example, after Arcola Williams testified that her son Thomas had been diagnosed with schizophrenia, the judge remarked: "Psychologists and psychiatrists love that one, paranoid schizophrenia." As Ms. Williams continued, describing her son's abnormal brain scan results, the judge said: "They did one on me and couldn't find a brain." Later, the judge derisively referred to Dr. Gelwan as "[p]ost traumatic syndrome man" and described the doctor's conclusions as "[p]ost-traumatic stress disorders, whatever that may be." When advised that Dr. Gelwan's testimony was concluding, the judge stated: "For the record, good." On another occasion, the judge interrupted Peoples' testimony regarding her father's abuse to inquire about the name of a particular hairstyle. While such comments by themselves may not establish a violation of *Townsend*, they certainly raise concerns as to whether Williams' evidence was appropriately considered.

because the record appears to have been fully developed as to Williams' claims, the district court's denial of an evidentiary hearing was not an abuse of discretion.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the ruling of the district court as to the claim of ineffective assistance of counsel at the penalty phase; we REVERSE the ruling of the district court as to Williams' *Batson* claim; and we AFFIRM the ruling of the district court as to the denial of an evidentiary hearing. We REMAND to the district court for proceedings consistent with this opinion.